UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

TIMOTHY J. RYAN and,
CHRISTINE A. RYAN,

                 Plaintiffs,

vs.

ADELE McGINN-LOOMIS and
MARY BENEDICT,

              Defendants.
_____/

Case No. 1:03-cv-439

Hon. David W. McKeague


**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................. 2

LAW AND ARGUMENT ............................................................................................... 7

I.      THE STANDARDS OF REVIEW. .................................................................... 7

II.     PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS AGAINST BOTH DEFENDANTS ARE
        NOT BARRED BY THE ROOKER-FELDMAN DOCTRINE ......................................... 9

        A.      The Rooker-Feldman Doctrine. ................................................................. 9

        B.      Defendants' Reliance on the *Rooker-Feldman* Doctrine is Misplaced. .................... 10

III.    THIS COURT SHOULD NOT ABSTAIN FROM HEARING PLAINTIFFS' CLAIMS
        AGAINST DEFENDANT MCGINN-LOOMIS UNDER THE YOUNGER DOCTRINE.
        ........................................................................................................................ 18

IV.     THE QUESTION WHETHER DEFENDANT MCGINN-LOOMIS WAS ACTING
        UNDER COLOR OF STATE LAW IS A QUESTION OF FACT FOR THE JURY TO
        DETERMINE. CONSEQUENTLY, DEFENDANT MCGINN-LOOMIS' 12(B)(6)
        MOTION IS PREMATURE. AND THE RYANS HAVE MADE SUFFICIENT
        ALLEGATIONS THAT DEFENDANT MCGINN-LOOMIS WAS ACTING UNDER
        COLOR OF STATE LAW TO SURVIVE A RULE 12(B)(6) MOTION ......................... 19

V.      THE PARRATT DOCTRINE IS INAPPLICABLE TO THE RYANS' § 1983 CLAIMS.
        ........................................................................................................................ 23

VI.     DEFENDANT MCGINN-LOOMIS IS NOT ENTITLED TO IMMUNITY FROM SUIT
        UNDER THE DOCTRINES OF ABSOLUTE OR QUASI-IMMUNITY ....................... 25

VII.    PLAINTIFFS HAVE SUFFICIENTLY PLEADED A CLAIM FOR CONSPIRACY
        AGAINST BOTH DEFENDANTS. .................................................................. 27

VIII.   PLAINTIFFS CAN MAINTAIN A CLAIM FOR MALICIOUS PROSECUTION
        AGAINST BOTH DEFENDANTS. .................................................................. 30

        A.      Termination in the Ryans' Favor. ......................................................... 30

        B.      Special Injury. ................................................................................. 31

IX.     PLAINTIFFS CAN MAINTAIN A CLAIM FOR ABUSE OF PROCESS AGAINST
        BOTH DEFENDANTS. ................................................................................. 34

X.      PLAINTIFFS HAVE PROPERLY ALLEGED A CLAIM OF INTENTIONAL
        INFLICTION OF EMOTIONAL DISTRESS AGAINST BOTH DEFENDANTS. ....... 36

CONCLUSION ............................................................................................................ 36

# INDEX OF AUTHORITIES

**Cases**

*Adickes v S.H. Kress and Co.,*
   398 U.S. 144; 90 S.Ct. 1598; 28 L.Ed.2d 142 (1970) ............................................................... 29

*Almond v DeKalb County, Georgia,*
   103 F.3d 1510 (11th Cir. 1997) ................................................................................................... 19

*Anderson v. Charter Township of Ypsilanti,*
   266 F.3d 487, 592-293 (6th Cir. 2001) ...................................................................................... 13

*Barnes v. Winchell,*
   105 F.3d 1111 (6th Cir. 1997) ..................................................................................................... 26

*Barrett v. Harrington,*
   130 F.3d 246 (6th Cir. 1997) ....................................................................................................... 25

*Bianci v. Rylaarsdam,*
   334 F.3d 895 (9th Cir. 2003) ....................................................................................................... 10

*Casa Marie, Inc. v. Superior Court,*
   988 F.2d 252 (1st Cir. 1993) ....................................................................................................... 12

*Chapman v. Higbee Co.,*
   319 F.3d 825 (6th Cir. 2003) ....................................................................................................... 20

*Community Treatment Ctrs., Inc. v. City of Westland,*
   970 F.Supp. 1197 (E.D.Mich. 1997) ............................................................................................. 9

*Cope v. Heltsley,*
   128 F.3d 452 (6th Cir. 1997) ....................................................................................................... 27

*Copeland v. Machulis,*
   57 F.3d 476 (6th Cir. 1995) ......................................................................................................... 24

*Crawford v. Chabot,*
   202 F.R.D. 223 (W.D.Mich. 1998) ................................................................................................ 9

*Denman v. Leedy,*
   479 F.2d 1097 (6th Cir. 1973) ..................................................................................................... 26

*Dennis v. Sparks,*
   449 U.S. 24; 101 S.Ct. 183; 66 L.Ed.2d 185 (1980) ............................................................. 12, 23

*District of Columbia Court of Appeals v. Feldman*,
  460 U.S. 462; 103 S.Ct. 1303; 75 L.Ed.2d 206 (1983) ... 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 36

*Dunn v. Tennessee*,
  697 F.2d 121 (6th Cir. 1992) ................................................................................................. 22

*Duran v. The Detroit News*,
  200 Mich App 622; 504 NW2d 715 (1993) ............................................................................ 36

*Hampton v Hanrahan*,
  600 F.2d 600 (7th Cir. 1979) ................................................................................................. 28

*Harlow v. Fitzgerald*,
  457 U.S. 800; 102 S.Ct. 2727; 73 L.Ed.2d 396 (1982) ......................................................... 26

*Hooks v Hooks*,
  771 F2d 935 (6th Cir. 1985) ................................................................................................. 28

*Hudson v. Palmer*,
  468 U.S. 529; 104 S.Ct. 3194; 82 L.Ed.2d 393 (1984) ......................................................... 24

*Jones v. Duncan*,
  840 F.2d 359 (6th Cir. 1988) ................................................................................................. 22

*Lansing Bd. Of Water and Light v. Deerfield Ins Co.*,
  183 F.Supp.2d 979 (W.D.Mich 2002) ................................................................................... 8

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163; 113 S.Ct. 1160; 122 L.Ed.2d 517 (1993) ....................................................... 8

*Lopez v. VanderWater*,
  620 F.2d 1229 (7th Cir. 1980) ............................................................................................... 23

*Parisi v Michigan Township Association.*,
  123 Mich App 512; 332 NW2d 587 (1982) ............................................................................ 31

*Pennzoil Co. v. Texaco, Inc.*,
  481 U.S. 1; 107 S.Ct. 1519; 95 L.Ed.2d 1 (1987) ................................................................. 12

*R.J.R. Services v. Aetna*,
  895 F.2d 279 (7th Cir. 1989) ................................................................................................. 33

*Redding v. St. Eward*,
  241 F.3d 530 (6th Cir. 2001) ................................................................................................. 19

*Scheid v Fanny Farmer Candy Shops, Inc.*,
   859 F.2d 434 (6th Cir. 1988)...........................................................................................9

*Sofamor Danek Group*, Inc.,
   123 F.3d 394 (6th Cir. 1997), *cert. denied*, 523 U.S. 1106; 118 S.Ct. 1675;
   140 L.Ed.2d 813 (1998) .................................................................................................8

*Stewart v. Fleet Financial Group*,
   Docket No. 96-2146, unpublished order of the Sixth Circuit Court of Appeals,
   filed November 4, 1997.............................................................................................16, 17

*Three Lakes Ass'n. v Whiting*,
   75 Mich App 564; 255 NW2d 686 (1977) ...................................................................33

*United States v. Owens*,
   54 F.3d 271 (6th Cir. 1995)............................................................................................9

*Vinson v. Cambell County Fiscal Court*,
   820 F.2d 194 (6th Cir. 1987).......................................................................................25

*Watts v. Burkhart*,
   854 F.2d 839 (6th Cir. 1988).......................................................................................24

*Weberg v Franks*,
   229 F3d 514 (6th Cir, 2000).........................................................................................28

*Wyllie v. Dunn*,
   460 U.S. 1086; 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983) ............................................22

*Young v. Murphy*,
   90 F.3d 1225 (7th Cir. 1996)........................................................................................17

*Zinerman v. Burch*,
   494 U.S. 113; 110 S.Ct. 975; 108 L.Ed.2d 100 (1990).............................................24

## Statute

42 U.S.C. § 1983 ......................................... 1, 2, 7, 11, 12, 13, 14, 15, 16, 19, 20, 22, 23, 29

## Federal Rules of Civil Procedure

Federal Rule of Civil Procedure 12(b)(6) ...........................................2, 9, 22, 29, 30, 33, 35, 36, 37

Federal Rules of Civil Procedure 12(b)(1).......................................................2, 7, 8, 9, 18, 19, 37

## INTRODUCTION

This case involves the separation of a child from her family. Plaintiffs, Timothy and Christine Ryan, are positioned no differently than the parents of a child who had been kidnapped. The trauma that they have been through is unimaginable. The Ryans fear that their daughter will never see them again. And even if she does, the lost time and contact are irreplaceable. They rightfully and legitimately seek compensation from those people responsible for taking their daughter away – Adele McGinn-Loomis and Mary Benedict.

Defendants Adele-McGinn Loomis, a Kent County Circuit Court Clerk, and Mary Benedict, a Grand Rapids attorney, conspired to use the court system to effect a *de facto* termination of the Ryans' parental rights to their then 16-year-old daughter Claire. They planned their scheme far in advance of their frivolous court filings. They hand-picked the judge to preside over the illegitimate court proceedings. They manipulated the random judicial assignment for civil cases. They lied to the state court. They perjured themselves in court pleadings. They engaged in illegal *ex parte* contacts with the judge whom they chose for the underlying proceedings. And although the underlying case was ultimately dismissed in the Ryans' favor, they were nonetheless successful in their efforts because they obtained their objective of depriving the Ryans of the care, custody, and management of their daughter Claire. Importantly, defendants achieved their success because McGinn-Loomis, in conspiracy with Benedict, abused McGinn-Loomis' position as a deputy court clerk.

The Ryans now seek compensation from those people responsible for, *inter alia*, the *de facto* termination of their parental rights. They seek this compensation under 42 U.S.C. § 1983 and various pendent state-law claims. In lieu of answering the Ryans' complaint, defendants have each filed separate motions and briefs to dismiss the complaint under Federal

1

Rules of Civil Procedure 12(b)(1) or 12(b)(6). The Ryans submit this single brief in opposition to the motions of both defendants.

For the reasons that follow, defendants motions to dismiss must be denied.

## BACKGROUND

As defendants have conceded, their motions under Rules 12(b)(1) and 12(b)(6) require this Court to limit its review to the well-pleaded allegations in the complaint. Despite these concessions, however, each defendant rarely cites to the complaint and each raises numerous "factual" assertions that the Ryans vigorously dispute and, more importantly, are beyond the scope of this Court's proper review. Although defendants have gone well beyond the pleadings in their presentation of the "facts," the Ryans will not. Except for a few paragraphs that respond to defendants' charges about the Ryans' decision to send their daughter to a boarding school in Utah, and defendants suggestion that the underlying case was settled, the Ryans will limit their recitation of the background of this case to the well-pleaded allegations of their complaint, only departing from this guiding principle when necessary to give context to the unsupported statements made by defendants.

This case arises out of conspiracy by the defendants, deputy Kent County Circuit Court Clerk Adele McGinn-Loomis and attorney Mary Benedict, to abuse the legal process for the purpose of separating a teenage girl from her family. The parents of that girl are the plaintiffs in this case, Timothy and Christine Ryan. The Ryans have been married to each other for 20 years. They have four children. Their oldest child is their daughter Claire Evelyn Ryan. Claire is currently 18 years old. When McGinn-Loomis and Benedict commenced their abusive litigation, Claire was 16 years old. Complaint, ¶ 12.

2

During the Spring and Summer of 2001, Claire had been dating a high school classmate by the name of Ryan McGinn. He is the son of defendant Adele McGinn-Loomis. During the Summer of 2001, defendant McGinn-Loomis, her son, and apparently Claire made a decision that they would all like Claire to leave the Ryan household and move in with the McGinn-Loomis family. The Ryans objected to this plan, and so Claire and McGinn-Loomis began laying plans for Claire to run away and move into the McGinn-Loomis household. Complaint, ¶¶ 7-12.

In early July 2001, Claire tried to run away, but her father prevented her from succeeding. Later in July 2001, McGinn-Loomis arranged for she and Claire to met with attorney Benedict. The purpose of that meeting was to develop a strategy for Claire to successfully and permanently leave her family.

Defendant McGinn-Loomis is a deputy court clerk for the Kent County Circuit Court. Complaint, ¶¶ 13, 15. The plan that was developed was for Claire to run away from home and be concealed in the McGinn-Loomis household. Complaint, ¶ 7. McGinn-Loomis believed that, because of her position with the Kent County Circuit Court, she would be able to persuade a Kent County Circuit Court Judge to sign an order granting her guardianship of Claire before the Ryans knew where Claire was.

On September 10, 2001, Claire did run away from home. Complaint, ¶ 8. She did move into the McGinn-Loomis household. Complaint, ¶ 9. Timothy Ryan discovered where Claire had gone and went to bring her home. But defendant McGinn-Loomis continued to conceal Claire in her home, and she stood in her driveway chanting and pointing at Mr. Ryan. Her son made obscene gestures. Only with police assistance was Mr. Ryan ultimately able to remove Claire from the McGinn-Loomis household. Complaint, ¶ 12.

3

In their briefs, defendants suggest that the Ryans did something wrong when they sent their daughter to Cross Creek Manor. But after Claire ran away from home, the Ryans discovered that she had been cutting herself with razor blades and found clothes with blood stains on them that corresponded to the areas where she had reportedly been cutting herself. The Ryans found a suicide note that Claire had prepared. Earlier in the Summer, Claire had been seeing a psychologist, and that psychologist had reported that Claire exhibited traits of a psychological disorder that carried with it a substantial increase in the risk of suicide. Also earlier in the Summer, Ryan McGinn had locked himself in his bedroom and threatened to kill himself. His mother reported to Mrs. Ryan that he routinely threatened to kill himself. As of September 17, 2001, the date that Mr. Ryan removed Claire from the McGinn-Loomis household with police assistance, Claire was apparently suicidal, engaging in extremely self-destructive behavior, had come under the negative influence of Benedict and McGinn-Loomis, and had developed this very unusual relationship with them.

The Ryans were afraid that their daughter was headed for teenage suicide and so they made the very difficult decision to send her to a boarding school in Utah with a residential treatment program, Cross Creek Manor. Complaint, ¶ 52. Cross Creek Manor had at least three things recommended that the Ryans found attractive and necessary to diffuse the immediate crisis – no McGinn-Loomis, no razor blades, and intensive psychotherapy. The Ryans are caring parents. They desperately wanted to help their troubled daughter, not hurt her.

On September 20, 2001, without the knowledge or consent of Claire, attorney Benedict, in conspiracy with McGinn-Loomis, filed a lawsuit entitled "Complaint for Return and Divorce from Parents." Complaint, ¶ 27, 43; Exhibit A to the Ryans' complaint. By that lawsuit, defendants sought to "divorce" Claire from her parents. Although the state-court

4

complaint was filed on September 20, 2001, the litigation actually began the night before when defendants conspired after hours to avoid the random judicial assignment required by law to secure the assignment of the judge of their choice, the Honorable Patricia Gardner. Complaint, ¶¶ 21-24. On September 19, 2001, Judge Gardner agreed to sign an order that defendant Benedict had prepared to send the police to take Claire away from the Ryans. Judge Gardner signed this order even though it stated that she had read a verified complaint and affidavit. Complaint, ¶¶ 40-42. There was no verified complaint and there was no affidavit. Judge Gardner also signed this order before the commencement of any legal proceeding. Complaint, ¶ 26. There was no notice to the Ryans and no attempt to notify the Ryans of this private meeting between Judge Gardner and attorney Benedict. Complaint, ¶ 26.

Later, defendant Benedict amended her complaint to attempt to set forth claims for "Emancipation" and "Abuse and Neglect." Complaint, ¶ 48; Exhibit F to the Ryans' complaint. Both of these claims were filed without the knowledge or consent of Claire. These claims were frivolous and wholly defective on their face. Complaint, ¶¶ 44, 77. Benedict also signed and filed a petition for guardianship which was perjurious on its face and which she withdrew a few days later. Complaint, ¶ 78. Benedict signed all of these pleadings even though they contained allegations that she knew to be false. All of these claims were ultimately dismissed on March 29, 2001, after the Ryans had filed a motion for summary disposition. Rather than allowing Judge Gardner to rule on that motion, attorney Benedict filed a motion requesting that the case be dismissed.

In their briefs, defendants suggest that the case ended with some sort of settlement that included a guardianship arrangement. There was a guardianship, but there was no settlement. Here is how the guardianship arose: Judge Gardner had ordered that Claire live in

5

foster care during the pendency of the litigation. By February 1, 2002, the foster care provider refused to allow Claire to remain in her home. The guardian ad litem told Mr. Ryan that unless he found somewhere for Claire to live she would require that Claire live at "The Bridge." The "Bridge" is a halfway house for runaways in Grand Rapids. There is no supervision. It is not the kind of place that the Ryans wanted their daughter to be.

Thus, as of February 1, 2003, the Ryans faced the following situation:

1.  Claire had no place to live.

2.  Claire refused to come home and, after several months of the influence of this horrible litigation, had developed a deep hostility for her parents.

3.  Forcing her to come home would add a huge amount of stress to the Ryans other children.

4.  The guardian ad litem was intent on getting some order to require Claire to live at "The Bridge."

A neighbor of the Ryans offered to take Claire in. This neighbor became the guardian. The neighbor's niece happens to be a lawyer in Grand Rapids and practices in the family court. She recommended that a guardianship order be entered. The Ryans agreed because:

1.  They were very comfortable with Claire living with this lady.

2.  The guardianship order prevented Claire from running away to the Loomis home.

3.  The guardianship order prevented Claire from having any contact with Adele McGinn-Loomis and allowed only limited supervised contact with her son.

This guardianship order was entered without the involvement, participation, or consent of Benedict. It was entered in a wholly separate proceeding with a new case number and a new judge, the Honorable Janet Haynes.

6

Even though all of defendants' claims were ultimately dismissed, defendants' conduct nonetheless had the effect of depriving the Ryans of their constitutional rights to the care, custody, and management of their child.

Before embarking on a discussion of the merits of defendants' motions, the Ryans must point out that the legal theories stated in their complaint are not novel. A case remarkably similar to this case is *Dykes v. Hosemann*, 743 F.2d 1488 (11th Cir 1984). That case arose out of a custody dispute in a divorce. The husband's father happened to be a Florida state-court judge who illicitly intervened with another Florida state-court judge, the defendant Hosemann. *Id.* at 1491-1492. Much like this case, *Dykes* involved illicit *ex parte* meetings with the judge, falsified court documents, and a series of orders issued without any evidence to support them that had the effect of terminating the mother's right to the custody of her son. The mother sued her ex-husband, both of the judges, and her ex-husband's lawyer, and the Eleventh Circuit held that she had stated valid claims under § 1983 against all defendants based on a conspiracy to violate her constitutional rights to the care, custody, and management of her child.

By this lawsuit, the Ryans, like the mother in *Dykes*, seek the relief that they are entitled to under § 1983 and the pendent state-law claims from this Court for defendants' roles in taking their daughter Claire away from them. Those claims should not be dismissed.

## LAW AND ARGUMENT

### I. THE STANDARDS OF REVIEW.

Each defendant has filed a motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). The Sixth Circuit recognizes two types of Rule 12(b)(1) motions. First, a defendant can make a "facial" attack challenging the sufficiency of the plaintiff's factual allegations. In such a motion, all well-pleaded factual

7

allegations are accepted as true.  Second, a defendant can make a "factual" attack challenging the

actual fact of subject matter jurisdiction, in which case the district court analyzes the motion

under Rule 56 standards.  See *Gillett v. United States*, 233 F.Supp.2d 874, 877 (W.D.Mich.

2002) (McKeague, J.), citing *Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 324 (6th

Cir. 1990).  Although defendants have not specified the type of Rule 12(b)(1) motions that they

have brought, it is clear that they are making a "facial" attack upon the Ryans' allegations.

Defendants have also filed a motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6).  Under Rule 12(b)(6), a district court may dismiss a claim "'only if it is clear

that no relief could be granted under any set of facts that could be proved consistent with the

allegations of the complaint.'" *Bosscher v. Township of Algoma*, 246 F.Supp.2d 791, 795

(W.D.Mich. 2003) (McKeague, J.), quoting *Zolman v. Internal Revenue Serv.*, 87 F.Supp.2d 763,

764 (W.D.Mich. 1999); see also *Conley v. Gibson*, 355 U.S. 41, 45-46; 78 S.Ct. 99; 2 L.Ed.2d 80

(1957).  (A district court cannot dismiss a complaint unless "it appears beyond doubt that the

plaintiff can prove no set of facts in support of its claim which would entitle it to relief.")  In

ruling on the motion, the district court must construe the allegations in the complaint in the light

most favorable to the plaintiff, accepting all factual allegations as true.  *Id.*; see also *In re

Sofamor Danek Group, Inc.*, 123 F.3d 394, 400 (6th Cir. 1997), *cert. denied*, 523 U.S. 1106; 118

S.Ct. 1675; 140 L.Ed.2d 813 (1998).

The pleading rules generally require only a "'short and plain statement of the

claim'"; they do not require detailed allegations.  *Lansing Bd. Of Water and Light v. Deerfield

Ins Co.*, 183 F.Supp.2d 979, 981 (W.D.Mich 2002) (McKeague, J.), quoting *Leatherman v.

Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168; 113 S.Ct. 1160;

122 L.Ed.2d 517 (1993).  In order to survive a 12(b)(6) motion, the complaint "'must contain

either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.'" *Id.*, quoting *Scheid v Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (emphasis in original).

As will be explained below, defendants' motions to dismiss under Rules 12(b)(1) and 12(b)(6) must be denied.

## II. PLAINTIFFS' 42 U.S.C. § 1983 CLAIMS AGAINST BOTH DEFENDANTS ARE NOT BARRED BY THE ROOKER-FELDMAN DOCTRINE

### A. The Rooker-Feldman Doctrine.

The *Rooker-Feldman* doctrine is "'a combination' of the abstention and res judicata doctrines . . . [and] stands for the proposition that a federal district court may not hear an appeal of a case already litigated in state court.'" *Crawford v. Chabot*, 202 F.R.D. 223, 228 (W.D.Mich. 1998) (McKeauge, J.), quoting *United States v. Owens*, 54 F.3d 271, 273 (6th Cir. 1995) (citing *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 476; 103 S.Ct. 1303; 75 L.Ed.2d 206 (1983), and *Rooker v. Fidelity Trust Co.*, 263 U.S. 413; 44 S.Ct. 149; 68 L.Ed. 362 (1923)). The *Rooker-Feldman* doctrine generally requires a federal district court

> 'to dismiss cases for lack of jurisdiction where: (1) the party against whom the doctrine is being applied had the opportunity to raise issues pending before the federal court in the instant case, or those inextricably intertwined therewith, in a prior state court proceeding; and (2) these issues, or those inextricably intertwined therewith, were adjudicated in the prior state court proceeding.'

*Id.*, quoting *Community Treatment Ctrs., Inc. v. City of Westland*, 970 F.Supp. 1197, 1214 (E.D.Mich. 1997).

The purpose of the *Rooker-Feldman* doctrine is "'to prevent a party losing in state court from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the losing party's claim that the state judgment itself violates the loser's federal rights.'" *Hood v. Keller*, 2003 FED App. 0314P (6th Cir., decided September 3, 2003), quoting *Tropf v. Fid. Nat'l Title Ins. Co.*, 289 F.3d 929, 936-937 (6th Cir.

2002), *cert. denied* 123 S.Ct. 887 (2003). Importantly, in deciding whether to apply the *Rooker-Feldman* doctrine, the federal district courts "'cannot simply compare the *issues* involved in the state-court proceeding to those raised in the federal-court plaintiff's complaint,'" but the courts "'must pay close attention to the *relief* sought by the federal-court plaintiff.'" *Id.*, quoting *Bianci v. Rylaarsdam*, 334 F.3d 895, 900 (9th Cir. 2003) (emphasis in original).

**B.      Defendants' Reliance on the *Rooker-Feldman* Doctrine is Misplaced.**

It is clear that the state court did not directly decide the claims presented by the Ryans in this federal action. The Ryans never claimed in the state court that defendants had violated their federal constitutional rights or that they were entitled to recover compensatory damages from defendants. In fact, as respondents to statutory emancipation and abuse and neglect claims, the Ryans could not have made such claims in the state court, because the state-court action was simply *not* a proper forum to seek the relief that they now seek in this federal action. Defendants here were technically not even parties to the state-court action. Consequently, in order for the *Rooker-Feldman* doctrine to apply, defendants must show that the Ryans' federal claims are "inextricably intertwined" with the state-court judgment. They cannot do so for several reasons.

First, it is important to recognize that the Ryans *prevailed* in the state court. The state court ultimately dismissed the case that attorney Benedict, in conspiracy with McGinn-Loomis, filed against the Ryans. This fact alone renders the *Rooker-Feldman* doctrine inapplicable, because the purpose for the doctrine is "'to prevent a party *losing* in state court from seeking what in substance would be appellate review of the state judgment in a United States district court, based on the *losing party's* claim that the state judgment itself violates the *loser's* federal rights.'" *Hood, supra*, quoting *Tropf, supra* (emphasis supplied). In other words, because the Ryans prevailed in the state court, no recognized purpose would be served in

denying the Ryans the opportunity to pursue their § 1983 claims, which arise specifically from *defendants' activities* in connection with the prosecution of the state-court action.

More importantly, defendants misconstrue the nature of the Ryans' federal claims and the relief that they seek from this Court. Although the state court lacked jurisdiction to enter *any* order in the underlying case (this is the only issue before the Michigan Court of Appeals), this Court's review of the propriety of the state-court orders and its final order dismissing the case is not essential to the Ryans' § 1983 claims. What is essential is a review of the propriety of *defendants' conduct* in connection with obtaining those orders and prosecuting the underlying state-court action. The state court's orders are jurisdictionally invalid and otherwise defective in numerous respects, and the Ryans are confident that the Michigan Court of Appeals will enter an opinion holding so. But defendants obtained the state-court orders through fraud, artifice, illegal *ex parte* contacts, malicious charges, and perjury, and through the abuse of McGinn-Loomis' position as a deputy court clerk. Thus, even if the state court appropriately handled the underlying case, the Ryans would nonetheless be permitted to maintain § 1983 claims against defendants, because their claims are not dependent, expressly or impliedly, upon the propriety of the state court's conduct or its orders.

This important distinction – between a challenge to the *state court decision* itself and a claim against the *people involved* in obtaining the decision – was recognized and discussed by Judge Posner in the Seventh Circuit's decision in *Nesses v. Shepard*, 68 F.3d 1003 (7th Cir. 1995):

> Were [the plaintiff] merely claiming that the decision of the state court was incorrect, even that it denied him some constitutional right, the [*Rooker-Feldman*] doctrine would indeed bar his claim. But if he claims, as he does, that people involved in the decision violated some independent right of his, as the right (if it is a right) to be judged by a tribunal that is uncontaminated by politics, then he can, without being blocked by the *Rooker-Feldman* doctrine, sue to vindicate that

right and show as part of his claim for damages that the violation caused the decision to be adverse to him. Otherwise there would be no federal remedy for violation of federal rights whenever the violator so far succeeded in corrupting the state judicial process as to obtain a favorable judgment, as alleged in cases such as *Dennis v. Sparks*, 449 U.S. 24; 101 S.Ct. 183; 66 L.Ed.2d 185 (1980), and *Casa Marie, Inc. v. Superior Court*, 988 F.2d 252, 259 (1ˢᵗ Cir. 1993). This result would be inconsistent with cases in which, for example, police officers are sued under 42 U.S.C. § 1983 for having fabricated evidence that resulted in the plaintiff's being convicted in a state court.

*Id.* at 1005 (some internal citations omitted).

As Judge Posner cogently recognized, plaintiffs, like the Ryans, must be allowed to pursue § 1983 claims against the *people involved* in obtaining harmful state-court orders, if the conduct of those people in connection with obtaining those orders resulted in a violation of the plaintiffs' constitutional rights. Otherwise, violators, like defendants, would escape liability, and injured plaintiffs, like the Ryans, would be denied a remedy, if the defendants so far succeeded in their illicit activities that they in fact obtained a favorable result in the state court.

True, the Ryans are not happy with the orders of the state court. They concede this. But they recognize that this Court is without jurisdiction to act as an appellate court to undue or overturn those orders. The Ryans simply seek damages from defendants flowing from *defendants' conduct* in connection with the prosecution of the state-court action. The *Rooker-Feldman* doctrine does not bar these claims. This is clear. *Nesses, supra.*

As evidenced by the preceding discussion, the Ryans' § 1983 claims are not "inextricably intertwined" with the state-court judgment. A "federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it." *Peterson v. Novelties, Inc. v. City of Berkley*, 305 F.3d 386, 391 (6ᵗʰ Cir. 2002), quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25; 107 S.Ct. 1519; 95 L.Ed.2d 1 (1987). "Though simple in concept, the doctrine is not easily applied." *Id.* And the Sixth Circuit has cautioned district courts against dismissing cases under the *Rooker-*

*Feldman* doctrine in situations where the question before the federal court does not implicate issues decided by an earlier state court. *Id.* at 393, citing *Anderson v. Charter Township of Ypsilanti*, 266 F.3d 487, 592-293 (6th Cir. 2001). When presented with a motion to dismiss under the *Rooker-Feldman* doctrine the focus should be "on whether the federal court, if it were to adjudicate [the plaintiff's] claims, would effectively be acting impermissibly as an appellate court reviewing the state court disposition." *Id.* at 391. This would not be the case should this Court exercise jurisdiction over this case.

In addition to the Seventh Circuit's decision in *Nesses, supra*, the Sixth Circuit's decision in *Peterson, supra*, also supports that the *Rooker-Feldman* doctrine does not bar the Ryans' claims. In *Peterson*, the plaintiffs, an entity selling fireworks and its owner, filed § 1983 claims against the City of Berkley and one of its police officers, following the police officer's seizure of fireworks from the plaintiffs and his arrest of several of the plaintiffs' employees. The police officer made the seizure and arrests while a state-court action was pending in which the plaintiffs were challenging the City's denial of the plaintiffs' application for a permit to sell fireworks, and while a temporary restraining order (entered May 9, 1996) issued by the state court was in effect compelling the City to allow the plaintiffs to sell fireworks not prohibited by law. The plaintiffs were contending in the state-court action that the City's denial violated various rights, and they requested that the state court order the City to grant the permit. *Peterson, supra* at 388-390.

Following the police officer's seizure of the fireworks and his arrests of the plaintiffs' employees, the plaintiffs filed a motion in the state court, arguing that the police officer's conduct violated the May 9 restraining order. *Peterson, supra* at 389. In ruling on the motion, the state court issued an order (on July 1, 1996) reaffirming its May 9 temporary

13

restraining order, but the Court did not find the City in contempt and it did not award contempt damages. *Id.*

After the state court proceedings were completed, the plaintiffs filed their § 1983 claims in federal court, alleging First Amendment Retaliation, the deprivation of property without due process of law, malicious prosecution, and unreasonable search and seizure. *Peterson, supra* at 390. The district court dismissed these claims under the *Rooker-Feldman* doctrine. But the Sixth Circuit reversed. After discussing the principles underlying the *Rooker-Feldman* doctrine, the Sixth Circuit stated:

> If the state court had, in the course of its opinion, held that the City had not acted illegally with respect to its search, seizure, and prosecution of [the plaintiffs'] property and employees, then [the plaintiffs'] federal claims could succeed 'only to the extent that the state court wrongly decided the issues before it.' However, the July 3 state court opinion does not discuss the legality of the City's actions; it merely reaffirms the validity of the court's earlier order while silently refusing to hold the City in contempt of that order. Therefore, the district court in the present case could give [the plaintiffs] relief on [their] federal claims without effectively finding that the state court wrongly decided any issues before it. For this reason, the *Rooker-Feldman* doctrine does not apply to bar the court's consideration of [the plaintiffs'] claims based on the state court's 1996 order.

*Peterson, supra* at 392 (internal citations omitted).

Likewise, if the state court here, in the course of its opinions or orders, had held that defendants, McGinn-Loomis and Benedict, had not violated the Ryans' constitutional rights in prosecuting the state-court action, then there might be an argument that the Ryans' federal claims could succeed "only to the extent that the state court wrongly decided the issues before it." *Peterson, supra.* But the constitutional claims now before this Court were never before the state court. The state court never addressed whether defendants deprived the Ryans of their constitutional rights to the care, custody, and management of their child. And the state court never addressed whether defendants deprived the Ryans of their rights to a fair, impartial, and randomly assigned state-court judge. This Court, therefore, *can* give the Ryans the relief that the

14

seek through their federal claims without effectively finding that the state court wrongly decided the issues before it, inasmuch as those issues were never (and could not have been presented) to the state court.

Defendants cite several cases that they claim support their contention that the Ryans' claims are barred by the *Rooker-Feldman* doctrine. None of those cases, however, provide such support. For example, on pages 8-10 of her brief, Benedict discusses *Ritter v. Ross*, 992 F.2d 750 (7th Cir. 1993). In *Ritter*, the plaintiffs filed § 1983 claims following the state court's entry of a tax lien foreclosure judgment against their real property. The plaintiffs argued in federal court that the state court foreclosure judgment constituted an unconstitutional deprivation of their property without due process of law. *Id.* at 751. On appeal from the district court decision dismissing the case, the Seventh Circuit relied *sua sponte* upon the *Rooker-Feldman* doctrine and affirmed the district court. *Ritter, supra* at 752-755. In doing so, however, the court found dispositive the plaintiffs' concessions that "but for the tax lien foreclosure judgment [in state court] they would have no complaint [in federal court]; they would still have their land and would have suffered no injury." *Id.* at 753. The Ryans make no such concession here. Instead, they rightfully contend that this Court can grant the relief that they seek by reviewing the defendants' conduct only, without review of the conduct of the state court.

Moreover, Benedict's suggestion that this Court could dismiss the Ryans' claims under *Ritter, supra*, because the Ryans had an adequate remedy under state law, namely, a motion for sanctions against attorney Benedict on the ground that her state-court filings were frivolous, is equally without merit. First, such a motion would have been futile if brought before defendants' hand-picked judge. More importantly, however, the relief available under a motion for sanctions, i.e., costs and reasonable attorney fees, would not have provided the Ryans with an

15

adequate remedy for the deprivations of the important constitutional liberty interests in question here.

Defendant McGinn-Loomis also cites (on page 9 of her brief) as analogous an unpublished decision of the Sixth Circuit, *Pancake v. McCowan*, 64 Fed. Appx. 464; 2003 U.S. App. LEXIS 8427 (6th Cir. April 30, 2003) (attached as Exhibit 3 to McGinn-Loomis' brief). *Pancake*, however, is not analogous to this case and does not support applying the *Rooker-Feldman* doctrine. In *Pancake*, the plaintiff, on behalf of herself and those similarly situated, brought § 1983 claims seeking declaratory relief and money damages. She claimed that the practice of certain Ohio state court judges of granting *ex parte* injunctions barring one party to a divorce action from the marital residence without notice and hearing was unconstitutional. *Id.* at *2. The district court dismissed the plaintiff's claims under the *Rooker-Feldman* doctrine, and the Sixth Circuit affirmed on the ground that "a federal court's review of [the plaintiff's] claim would involve an inquiry into whether the actions taken by the state court violated Pancake's constitutional rights." *Id.* at * 6. But as discussed above, unlike in *Pancake*, *supra*, this Court is not required to make any inquiry into the *actions of the state court* in reviewing the Ryans' claims. To the contrary, it is the *defendants' conduct* that is in question here. See *Nesses, supra*.

Likewise, McGinn-Loomis' reliance (on page 10 of her brief) upon the unpublished decision of the Sixth Circuit in *Stewart v. Fleet Financial Group*, Docket No. 96-2146, unpublished order of the Sixth Circuit Court of Appeals, filed November 4, 1997 (attached as Exhibit 4 to McGinn-Loomis' brief), is equally misplaced. There, the Sixth Circuit properly found that, under the *Rooker-Feldman* doctrine, a "plaintiff's claims are 'inextricably intertwined' if he claims an injury as a result of the state court decisions." *Id.* at p. 3. Here, the Ryans are claiming an injury as a result of *defendants' conduct*, not the state-court decisions. As

explained in *Nesses*, *supra*, the Ryans' claims are not barred by the *Rooker-Feldman* doctrine. *Stewart*, *supra*, provides no support for defendants.

Finally, McGinn-Loomis again misconstrues the nature of the Ryans' claims when she relies upon the Seventh Circuit's decision in *Young v. Murphy*, 90 F.3d 1225 (7th Cir. 1996). In *Young*, the Seventh Circuit upheld the dismissal of the plaintiff's case under the *Rooker-Feldman* doctrine, because the plaintiff "specifically" sought to have the federal district court "review the specifics" of the state court proceeding, "declare" that the state court had erred, and award damages to the plaintiff resulting from those errors. *Id.* at 1231. Also, in *Young*, the consequences of the allegedly unconstitutional state-court proceeding had already been rectified when the plaintiff presented his claims to the federal district court. *Id.* *Young* is clearly dissimilar to this case.

The Ryans are not specifically (or generally for that matter) asking this Court to review the specifics of the state-court proceeding, declare that the state-court erred in those proceedings, and award them damages as a result of those errors. Nor has the effect of defendants' unconstitutional conduct ever been rectified. Instead, the Ryans are asking this Court to review the propriety of *defendants' conduct* which resulted in damages to the Ryans and which has not been rectified. The *Rooker-Feldman* doctrine does not apply to the Ryans' claims.

Defendants would have this Court refuse to hear the Ryans' claims simply because defendants were successful in their efforts to violate the Ryans' constitutional rights. But *Nesses*, *supra*, recognizes that the *Rooker-Feldman* doctrine is not intended to bar claims against defendants who succeed in their illicit objectives when those claims go directly to the propriety of the defendants' conduct and not to the propriety of the state-court judgment. And even without reference to the Seventh Circuit's decision in *Nesses*, *supra*, the *Rooker-Feldman*

17

doctrine does not apply here because, in order for the Ryans to prevail on their § 1983 claims, it is not necessary for this Court to review the propriety of the state court's conduct; it is only necessary for this Court to review the propriety of *defendants' conduct* in connection with their prosecution of the state-court proceeding. Thus, the Ryans' claims are not barred by the *Rooker-Feldman* doctrine, nor are they inextricably intertwined with the state-court decisions.

Because the *Rooker-Feldman* doctrine does not bar the Ryans' claims, this Court should deny defendants' motion to dismiss under Rule 12(b)(1).

## III.   THIS COURT SHOULD NOT ABSTAIN FROM HEARING PLAINTIFFS' CLAIMS AGAINST DEFENDANT MCGINN-LOOMIS UNDER THE YOUNGER DOCTRINE.

Defendant McGinn-Loomis next argues (on pages 11-13 of her brief) that this Court should abstain from exercising jurisdiction over this case under the *Younger* doctrine. See *Younger v. Harris*, 401 U.S. 37; 91 S.Ct. 746; 27 L.Ed.2d 669 (1971)  Under the *Younger* doctrine, a federal court may abstain from exercising jurisdiction over a case only where three criteria are met: "there are state proceedings that are (1) currently pending; (2) involve an important state interest; and (3) will provide the federal plaintiff with an adequate opportunity to raise his or her constitutional claims." *Habich v. City of Dearborn*, 331 F.2d 524, 530 (6th Cir. 2003).

Although the Ryans are currently appealing the decision of the state court in the Michigan Court of Appeals, the "key question here is whether the state proceeding would afford [plaintiffs] an adequate opportunity to raise [their constitutional claims]." *Habich, supra*. The answer is, No. In their pending state-court appeal, the Ryans are asking the Michigan Court of Appeals to declare all orders entered by the state court *void ab initio* on the ground that the state court lacked subject-matter jurisdiction to enter *any* order in connection with the case. The question before this court – whether defendants violated the Ryans' constitutional rights – is *not*

before the Michigan Court of Appeals and was never before the state court. Nor could it have been in the context of the emancipation and abuse and neglect actions to which defendants were technically not even parties. The Ryans have not raised, nor was there any opportunity for them to raise, their constitutional claims in the pending state-court action or appeal.

Thus, because the state-court proceeding involved only the collateral issue of whether the Ryans' daughter Claire should be emancipated from the Ryans, and because the state-court appeal involves only the collateral issue of whether the state court possessed subject-matter jurisdiction over the underlying action, there was no opportunity for the Ryans to raise the question of whether the defendants violated their constitutional rights in the state court. See *Habich, supra.* The *Younger* doctrine is simply not applicable, and McGinn-Loomis' motion to dismiss under Rule 12(b)(1) should be denied.

## IV. THE QUESTION WHETHER DEFENDANT MCGINN-LOOMIS WAS ACTING UNDER COLOR OF STATE LAW IS A QUESTION OF FACT FOR THE JURY TO DETERMINE. CONSEQUENTLY, DEFENDANT MCGINN-LOOMIS' 12(B)(6) MOTION IS PREMATURE. AND THE RYANS HAVE MADE SUFFICIENT ALLEGATIONS THAT DEFENDANT MCGINN-LOOMIS WAS ACTING UNDER COLOR OF STATE LAW TO SURVIVE A RULE 12(B)(6) MOTION.

Defendant McGinn-Loomis next argues that she was not acting under color of state law sufficient to support a § 1983 claim. "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Adkins*, 487 U.S. 42, 47; 108 S.Ct. 2250; 101 L.Ed.2d 40 (1988); *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). Although on page 15 of her brief, McGinn-Loomis cites an Eleventh Circuit decision, *Almond v DeKalb County, Georgia*, 103 F.3d 1510 (11th Cir. 1997), for the proposition that the question whether a person has acted under color of state law is one of

law for the court to decide, this is not accurate under prevailing Sixth Circuit authority. Consequently, McGinn-Loomis' motion is premature.

> The inquiry is fact-specific, and the presence of state action is determined on a case-by-case basis. Although 'it is possible to determine . . . whether a person acted under color of state law as a matter of law, there may remain in some instances unanswered questions of fact regarding the proper characterization of the actions for the jury to decide.'

*Chapman v. Higbee Co.*, 319 F.3d 825, 834 (6th Cir. 2003) (internal citations omitted).

The Ryans agree that just because a state employee engages in tortious conduct does not mean that the state employee has acted under "color of state law." But "[i]t is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given him by the State." *West, supra* at 487 U.S. at 49-50. Here, even without engaging in discovery, there are several reasons for concluding that McGinn-Loomis engaged in such abuse.

The following facts are undisputed by defendants. During all relevant time periods, McGinn-Loomis was (and still is) a deputy court clerk employed by the State of Michigan and assigned to the Kent County Circuit Court. Defendant McGinn-Loomis' brief, p. 1. In the Summer of 2001, the Ryans' daughter Claire was dating McGinn-Loomis' son, Ryan McGinn. Defendant McGinn-Loomis' brief, p. 2. During this time period, McGinn-Loomis put Claire in touch with Benedict, an attorney with whom defendant McGinn-Loomis was familiar by virtue of her position as a court clerk. She put Claire in touch with attorney Benedict so that Claire might pursue legal action against her parents. Defendant McGinn-Loomis' brief, p. 2.

On September 19, 2001, after normal working hours, McGinn-Loomis called Kent County Circuit Court Judge Patricia Gardner's court reporter at home and asked for Judge Gardner's home telephone number. Defendant McGinn-Loomis' brief, p. 2. Upon learning that McGinn-Loomis wanted to speak to her, Judge Gardner telephoned McGinn-Loomis at home,

again after working hours. Defendant McGinn-Loomis' brief, p. 2. During this telephone conversation, Judge Gardner advised McGinn-Loomis that she could provide her home phone number to attorney Benedict and agreed to discuss the Ryan "matter" with attorney Benedict. Defendant McGinn-Loomis' brief, p. 2. Judge Gardner did in fact discuss the Ryan matter with attorney Benedict, after working hours and without notice to the Ryans, and she signed an order requiring the police to take the Ryans' daughter Claire away from them. Defendant Benedict's brief, p. 4. The order recited that Judge Gardner had read and considered a verified motion and affidavit when no such pleadings existed, see Exhibit C to the Ryans' complaint, although it is unknown what attorney Benedict or McGinn-Loomis might have told Judge Gardner regarding the existence of these pleadings.

The following day, attorney Benedict filed the order that Judge Gardner had signed the night before, along with a complaint captioned "Complaint for Return and Divorce from Parents," in the same Kent County Circuit Court Clerk's office where McGinn-Loomis worked. Defendant Benedict's brief, p. 3. Defendant Benedict directed the court clerk who accepted the order and complaint for filing to assign the case to Judge Gardner, and the court clerk complied with Benedict's direction. See Exhibit D to the Ryans' complaint. As a result, Judge Gardner was never randomly assigned to preside over the underlying case. Instead, she was hand-picked by defendants. It is unknown what the court clerk who accepted the pleadings for filing knew about the matter, whether she had discussions about the filing with McGinn-Loomis, or what role McGinn-Loomis played in connection the intake of the new matter.

Although defendants' concessions certainly answer some questions about McGinn-Loomis' role in the manipulation of the judicial assignment and the deprivation of the

21

Ryans' constitutional right to the care, custody, and management of their daughter, they give rise

to many more questions – all of which the Ryans seek to answer through discovery.

Under Rule 12(b)(6), a district court may dismiss a claim "'only if it is clear that

no relief could be granted under any set of facts that could be proved consistent with the

allegations of the complaint.'" *Bosscher*, *supra*, quoting *Zolman*, *supra*. This clearly cannot be

said about the allegations in the Ryans' complaint, especially in a § 1983 case.

> In *Dunn v. Tennessee*, 697 F.2d 121 (6th Cir. 1992), *cert. denied sub nom. Wyllie v. Dunn*, 460 U.S. 1086, 103 S.Ct. 1778, 76 L.Ed.2d 349 (1983), this court reiterated the standard used for reviewing the sufficiency of the allegations in a complaint for an action under section 1983:
>
>> Dismissals of complaints under the civil rights statutes are scrutinized with special care. A complaint need not set down in detail all of the particularities of a plaintiff's claim against a defendant. Rule 8(a)(2) simply requires short and plain statement of the claim showing that the pleader is entitled to relief . . ..' Fed. R. Civ. P. 8(a)(2). All a complaint need do is afford the defendant 'fair notice of what the plaintiff's claim is and the grounds upon which it rests.' [cites omitted]. A motion to dismiss under Rule 12(b)(6) should not be granted 'unless *it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.* [cites omitted]. [emphasis added].
>
> In order to state a claim under section 1983, a plaintiff must allege two elements: (1) the plaintiff must show a deprivation of rights secured by the "Constitution and law" of the United States, and (2) plaintiff must show that the defendant deprived him of this federal right "under color of law."

*Jones v. Duncan*, 840 F.2d 359, 361-362 (6th Cir. 1988) (some internal citations omitted) (emphasis in original).

The Ryans have clearly made sufficient allegations that defendant McGinn-

Loomis acted "under color of state law" to survive a 12(b)(6) motion. Whether the will prevail

at trial (or against a Rule 56 motion) is another question that is premature to ask.

Moreover, although Judge Gardner, the state-court judge who presided over the

underlying action, is generally immune from liability, her conduct and participation in the

deprivation of the Ryans' constitutional rights may also satisfy the color of state law requirement even though she is presently not a party to this lawsuit. See, e.g., *Dennis v. Sparks*, 449 U.S. 24, 29; 101 S.Ct. 183; 66 L.Ed.2d 185 (1980) ("Private parties who corruptly conspire with a judge in connection with such conduct are thus acting under color of state law within the meaning of § 1983 as it has been construed in our prior cases.")

For these reasons, defendant McGinn-Loomis' motion to dismiss on this ground must be denied.

## V. THE PARRATT DOCTRINE IS INAPPLICABLE TO THE RYANS' § 1983 CLAIMS.

Defendant McGinn-Loomis next argues (on pages 16-19 of her brief) that she did not engage in conduct that resulted in the deprivation of the Ryans' constitutional rights. McGinn-Loomis does not challenge (nor could she) the legitimacy of the constitutionally protected liberty interests at stake, namely, *inter alia*, the Ryans' right to the care, custody, and management of their children, see *Troxel v. Granville*, 530 S.Ct. 56, 65-66; 120 S.Ct. 2054; 247 L.Ed.2d 49 (2000); their right to a disinterested judge, *Lopez v. VanderWater*, 620 F.2d 1229, 1235-1236 (7th Cir. 1980); and their right to a judge who had not prejudged their case, *Lopez, supra*. McGinn-Loomis merely contends that the Ryans are required to "plead (and ultimately show) that the state corrective procedures were inadequate to correct the constitutional violation." See McGinn-Loomis' brief, p. 17. In essence, McGinn-Loomis is arguing that the *Parratt* doctrine warrants dismissal of the Ryans' § 1983 claims. See *Parratt v. Taylor*, 451 U.S. 1908; 101 S.Ct 1908; 68 L.Ed.2d 420 (1981). But the *Parratt* doctrine has no applicability to the Ryans' claims.

The *Parratt* doctrine permits dismissal of a procedural due process claim if: (1) the deprivation of property was unpredictable or random; (2) predeprivation process was

impossible or impracticable; and (3) the state actor was not authorized to take the action that deprived the plaintiff of property or liberty. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995). If these conditions are met, then a procedural due process claim will not be stated unless the plaintiff pleads and proves that available state remedies are inadequate to address the wrong. *Id.* "The underlying rationale of *Parratt* is that when deprivations of property are effected through random and unauthorized conduct of state employees, predeprivation procedures are simply 'impracticable' since the state cannot know when such deprivations will occur." *Hudson v. Palmer*, 468 U.S. 529, 533; 104 S.Ct. 3194; 82 L.Ed.2d 393 (1984). Importantly, however, the *Parratt* doctrine is "clearly inapplicable 'where a deprivation of property is caused by conduct pursuant to established state procedure, rather than random and unauthorized conduct.'" *Watts v. Burkhart*, 854 F.2d 839, 843 (6th Cir. 1988), quoting *Hudson, supra* at 532.

Here, the Ryans clearly allege that there are "established state procedures" through which they ultimately suffered the loss of the care, custody, and management of their daughter. Those procedures are enumerated in ¶ 91 of the Ryans' complaint. Although these "established state procedures" were clearly not followed (which the Ryans also allege), this does not matter for purposes of a *Parratt* doctrine analysis. The *Parratt* doctrine becomes inapplicable when the claimed deprivations were allegedly accomplished through "established state procedures," but those procedures were not properly followed. See, e.g., *Zinerman v. Burch*, 494 U.S. 113, 136-138; 110 S.Ct. 975; 108 L.Ed.2d 100 (1990) ("[I]t would indeed be strange to allow state officials to escape § 1983 liability for failing to provide constitutionally procedural protections by assuming that those procedures would be futile because the same state officials would find a way to subvert them.")

More importantly, McGinn-Loomis fails to account for the fact that the deprivation of the Ryans' right to the care, custody, and management of their daughter is a *substantive due process* violation for which the *Parratt* doctrine has no applicability. It cannot be disputed that the Ryans have a "fundamental liberty interest" in the care, custody, and management of their children. *Vinson v. Cambell County Fiscal Court*, 820 F.2d 194, 200 (6th Cir. 1987). It also cannot be disputed that the allegations in the Ryans' complaint against both defendants are sufficient enough to state such a violation. *Id.* at 201 ("[The defendant's] alleged unlawful deprivation of plaintiff's liberty interest in the custody of her children was, in our view, an egregious abuse of governmental power sufficient to state a substantive due process violation.") When a violation of substantive due process is sufficiently alleged, the existence of state postdeprivation remedies that might support application of the *Parratt* doctrine "has no bearing on whether a cause of action exists," and the *Parratt* doctrine consequently has no applicability. *Id.* at 198.

For these reasons, this Court should not grant defendant McGinn-Loomis' motion to dismiss under the *Parratt* doctrine.

## VI.   DEFENDANT MCGINN-LOOMIS IS NOT ENTITLED TO IMMUNITY FROM SUIT UNDER THE DOCTRINES OF ABSOLUTE OR QUASI-IMMUNITY.

Defendant McGinn-Loomis next moves to dismiss the Ryans' claims (pages 19-20 of her brief) on the ground that she is immune from suit. She first argues that she is absolutely immune from liability. The Ryans acknowledge that judges are generally immune from § 1983 claims for acts performed in their judicial capacities under the doctrine of judicial immunity. *Barrett v. Harrington*, 130 F.3d 246, 253-254 (6th Cir. 1997). And the Ryans also acknowledge that court clerks are generally entitled to absolute immunity under the doctrine of quasi-judicial immunity, as long as the plaintiff's allegations relate to an act performed by the

25

clerk with the scope of the clerk's official quasi-judicial duties. *Denman v. Leedy*, 479 F.2d 1097 (6th Cir. 1973). The cloak of quasi-judicial immunity, however, covers only "those persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune." *Bush v. Rauch*, 38 F.3d 842, 847 (6th Cir. 1994). Importantly, the defendant carries the burden of proof to show that a plaintiff's claims are barred by the doctrine of immunity. *Barnes v. Winchell*, 105 F.3d 1111, 1115 (6th Cir. 1997).

Defendant McGinn-Loomis cannot seriously argue that her conduct, as alleged in the Ryans' complaint, related to the performance of "tasks so integral or intertwined with the judicial process that [she should be] considered an arm of the judicial officer who is immune." *Bush, supra.* There is nothing quasi-judicial in coordinating (and engaging in) an illicit *ex parte* contact with a judge. Nor is conspiring to manipulate the random judicial assignment for a civil action a task integral with the judicial process. And lying to the Court and conspiring to submit false pleadings are not functions so intertwined with judicial process that the person who so lies and conspires is considered an arm of the judicial officer cloaked with immunity. McGinn-Loomis' conduct, as alleged in the Ryans' complaint, is not subject to the doctrine of quasi-judicial immunity.

McGinn-Loomis is also not qualifiedly immune from liability. Under the doctrine of qualified immunity, as discussed in *Harlow v. Fitzgerald*, 457 U.S. 800, 818; 102 S.Ct. 2727; 73 L.Ed.2d 396 (1982), a government official who is engaged in a discretionary function is generally "'shielded from liability [and, indeed, from suit] for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person

would have known.'" *Cope v. Heltsley*, 128 F.3d 452, 457 (6th Cir. 1997). McGinn-Loomis is unquestionably not qualifiedly immune from liability.

The Ryans' right to the care, custody, and management of their daughter is a clearly established constitutional right of which a reasonable person would have known. See *Troxel, supra*. This cannot be legitimately contested. "The liberty interest at issue in this case – the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]." *Troxel, supra* 530 U.S. at 65. If it cannot be said that a reasonable person would believe that *this constitutional right* is clearly established, then no right would ever be so considered.

The Ryans have properly alleged that McGinn-Loomis, in conspiracy with Benedict, engaged in illicit activities and misused McGinn-Loomis' position as a court clerk to deprive the Ryans of, *inter alia*, the most fundamental of constitutional rights. McGinn-Loomis cannot hide behind the cloak of absolute or qualified immunity on these facts and allegations. Her motion to dismiss under 12(b)(6) must be denied.

## VII.   PLAINTIFFS HAVE SUFFICIENTLY PLEADED A CLAIM FOR CONSPIRACY AGAINST BOTH DEFENDANTS.

Defendants have argued that the Complaint does not sufficiently state a claim for conspiracy because there are "no material factual allegations supporting the existence of a single common plan between" between defendants. Of course, the conspiracy is sufficiently alleged.

The law on what must be alleged and proven to support a claim for civil conspiracy is well settled:

> A civil conspiracy is an agreement between two or more persons to injure another by unlawful action. Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy. Each conspiracy need not have known all of the details of the illegal plan or all of the participants involved. All that must be shown is that there was a single plan, that the alleged co-conspirator shared in the general conspiratorial objective, and that an overt act

27

was committed in furtherance of the conspiracy that caused injury to the complainant.

*Weberg v Franks*, 229 F3d 514, 526 (6th Cir, 2000); *Hooks v Hooks*, 771 F2d 935, 943-44 (6th Cir, 1985).

An express agreement among all the conspirators is not a necessary element of the conspiracy. *Hampton v Hanrahan*, 600 F.2d 600 (7th Cir. 1979).  Nor is the plaintiff required to show that each participant in a conspiracy knew the exact limits of the illegal plan or the identity of all the participants. *Id*. at 621.

Here, the Ryans allege a common plan and that plan was to deprive them of their constitutional right to the care, custody, and management of their child, Claire. The Ryans allege that the method for accomplishing this was to abuse the legal process and McGinn-Loomis' position as a deputy court clerk. The plan was to hand pick the judge whom defendants preferred for their lawsuit, gaining unlawful *ex parte* access to that judge, and prosecuting baseless and frivolous claims in a proceeding presided over by their hand-picked judge.

The Ryans allege specific facts which demonstrate the existence of this conspiracy:

1.  That Claire ran away and ran to the McGinn-Loomis household. Complaint, ¶¶ 8-9.

2.  That McGinn-Loomis concealed Claire in her home. Complaint, ¶ 10.

3.  That after Mr. Ryan with police assistance regained his daughter, McGinn-Loomis contacted Benedict. Complaint, ¶ 12.

4.  That before Claire ran away Loomis and Benedict has collaborated in preparing some guardianship petition which would have appointed Loomis, as Claire's Guardian. Complaint, ¶ 11.

5.  That after the close of normal Court business hours McGinn-Loomis contacted Judge Gardner at her home and asked that she act in this case before it had been filed and asked that she meet privately with attorney Benedict. Complaint, ¶ 21.

28

6.   That McGinn-Loomis did in fact arrange for a private meeting between Judge Gardner and attorney Benedict.  Complaint, ¶ 22.

7.   That the private meeting between attorney Benedict and Judge Gardner did occur on the night before the case was filed.  Complaint, ¶ 23.

8.   That during the Summer of 2001, Claire had collaborated with McGinn-Loomis for Claire to run away from her parents home and move into the McGinn-Loomis household.  Complaint, ¶ 7.

9.   That after Benedict, with the assistance of McGinn-Loomis, had procured the improper assignment of Judge Gardner and after they had engaged in the improper private meeting and procured an improper *ex parte* order, Benedict then filed a series of malicious and frivolous claims.  Complaint, ¶¶ 20, 27-77.

*Adickes v S.H. Kress and Co.*, 398 U.S. 144; 90 S.Ct. 1598; 28 L.Ed.2d 142

(1970), was an action brought under § 1983 against a private party, a restaurant.  In *Adickes*, the

allegation was that the restaurant had conspired with a police officer to refuse to serve the

plaintiff based on race.  The only allegation that pointed to a conspiracy was that the police

officer was present  when the plaintiff was denied service.  In addressing the issue of the

sufficiency of proof of a civil conspiracy, the Supreme Court said that the question of the

existence of a conspiracy was a question for the jury so long it was possible for the jury to "infer

from the circumstances [that the alleged conspirators] had a meeting of the minds and thus

reached an understanding to achieve the conspiracy's objectives."  *Adickes*, *supra*, 298 U.S. at

158-159.

Certainly under the facts as alleged, a jury could infer that Benedict and McGinn-

Loomis had a common plan – to take Claire away from her family – and to accomplish that plan

they agreed to abuse McGinn-Loomis' position as a court employee to secure an improper

judicial assignment and an improper *ex parte* meeting and thereby facilitate the prosecution of

the frivolous and malicious claims.  The Ryans' allegations are sufficient to survive a 12(b)(6)

motion, and defendants' motions to dismiss should be denied.

29

## VIII.  PLAINTIFFS CAN MAINTAIN A CLAIM FOR MALICIOUS PROSECUTION AGAINST BOTH DEFENDANTS.

The defendants have claimed that the malicious prosecution counts have not been sufficiently pleaded because the Ryans do not allege that the prior action terminated in their favor and do not allege "special injury." These contentions are without merit.

### A.    Termination in the Ryans' Favor.

The Ryans allege that the underlying litigation "terminated with a dismissal of all claims against the plaintiffs." Complaint, ¶ 123. This is a Rule 12(b)(6) motion that challenges the sufficiency of the allegations of the complaint, not a summary judgment motion under Rule 56. *The complaint could not more clearly and directly allege that the underlying litigation terminated in the Ryans' favor*. Thus, on that basis alone, this argument of defendants should be rejected.

But defendants go on to say that because the "claim for emancipation was dismissed *without prejudice*," the proceedings did not in fact terminate in the Ryans' favor. First, only two of the three claims that defendants filed were dismissed without prejudice. The divorce from parent claim was dismissed *with prejudice* at the outset of the litigation. The emancipation, and abuse and neglect claims were dismissed *without prejudice*. Here is how that came to be: The Ryans filed a motion for summary disposition and to declare all interim orders void *ab initio*. The hearing on that motion was scheduled for March 22, 2002. Rather than allow Judge Gardner to rule on that motion, attorney Benedict, filed a motion to dismiss. Judge Gardner granted attorney Benedict's motion to dismiss and then refused to rule on the Ryans' motion for summary disposition.

The Michigan Court of Appeals has held that the "termination-in-favor-of-plaintiff" element of a malicious prosecution claim is satisfied when the person who brings the

30

underlying claim withdraws it. In *Parisi v Michigan Township Association.*, 123 Mich App 512, 516; 332 NW2d 587 (1982), the Court, quoting favorably from the Third Restatement on Torts, stated:

> Civil proceedings may be terminated in favor of the person against whom they are brought under the rule stated in clause (b)(1) by the favorable adjudication of the claim by a competent tribunal or (2) *by the withdrawal of the proceedings by the person bringing them*, or (3) by the dismissal of the proceedings because of his failure to prosecute them.

Emphasis supplied.

In this case, attorney Benedict filed a "Divorce from Parents" claim. Claire has not been divorced from her parents. Attorney Benedict filed an Emancipation claim. Claire has not been emancipated. Attorney Benedict filed an Abuse and Neglect claim. There has never been any ruling that Claire was a victim of abuse or neglect. Every single claim attorney Benedict filed has been dismissed. The fact that they were dismissed at her insistence does not mean that the case terminated in her favor. The Ryans were clearly the prevailing parties.

**B.     Special Injury.**

The defendants also claim that the complaint does not sufficiently allege special injury, another required element of malicious prosecution claim. But at ¶ 26 of the complaint, the Ryans allege:

> By reason of defendants' malicious prosecution of their claims in case no. 01-09528-DZ, plaintiffs have suffered a deprivation of their right to the care, custody, and companionship of their daughter and this constitutes special injury.

That this allegation satisfies the requirement that the plaintiffs plead special injury is confirmed by the seminal Michigan case on this issue, *Friedman v Dozorc*, 412 Mich 1; 312 NW2d 585 (1981). In that case, the Michigan Supreme Court described the special injury required to support a malicious prosecution claim as follows: "injury to one's fame (by scandalous allegation), injury to one's person or to liberty, and injury to one's property." *Id.* at 34. Of

particular relevance to this case is the *Friedman* court's discussion at footnote 33 where it gave the following example of the type of deprivation that would constitute special injury:

> North Carolina follows the "English Rule" and extends the tort of malicious prosecution only "to include malicious institution of civil proceedings which involve an arrest of the person or seizure of property or which result in some special damage." (Citation omitted.) "The driver's license once issued is a significant interest subject to constitutional due process protections." (Citation omitted.) And deprivation thereof may therefore be regarded as equivalent to a seizure of property, i.e., special injury.

Thus, *Friedman* clarifies that the deprivation of a constitutionally protected liberty interest constitutes special injury which can support a malicious prosecution cause of action. Of course, the care, custody, and management of one's child is a significant liberty interest protected by the Fourteenth Amendment to the United States Constitution. *Troxel*, *supra*. Since the defendants' conduct in connection with the underlying litigation had the effect of depriving the Ryans of that right, they have suffered special injury.

Defendants also claim that there is no special injury because the damage to the parent-child relationship is an injury which "would necessarily occur in all suits prosecuted for similar causes of action." Benedict's brief, p.14. This argument misconstrues the nature of the injury alleged as "special." It also evidences a misunderstanding of the law.

The special injury alleged in the complaint is not the emotional damage caused to the parent-child relationship. The special injury alleged is the deprivation of the legal right to the care, custody, and management of a child. The deprivation of this constitutional right is not an item of damage that would necessarily flow from the prosecution of any similar suit. Presumably, in any other similar case that had been filed where there was no divorce from parent decreed, no emancipation ordered, and no abuse and neglect found, the parents would *not* have been deprived of the care, custody, and management of their child. Thus, the deprivation that constitutes special injury here was not a necessary outcome of this litigation.

32

When defendants say that the rule that special injury requires some injury that "would not necessarily occur in all suits prosecuted for similar causes of action" applies here, they are taking the courts' statements entirely out of context. The rule involved is designed to explain that damage caused by the litigation does not constitute special damages. For instance, in *Friedman, supra*, the subject of the underlying case was medical malpractice. The court in *Friedman* explained that, in the malicious prosecution case, this peripheral type of damage would not satisfy the special injury requirement. Similarly, in *R.J.R. Services v. Aetna*, 895 F.2d 279, 284 (7th Cir. 1989), the Court held that damage to the plaintiff's reputation that flowed from the underlying fraud lawsuit did not constitute special injury, because this peripheral type of damage would be expected to "normally arise in defending a similar lawsuit."

Where, as here, the damage that flows directly from the maliciously filed lawsuit constitutes a deprivation of a constitutionally guaranteed liberty interest, the "special injury" requirement is satisfied.

For these reasons, this Court should deny defendants' motions to dismiss the Ryans' malicious prosecution claim under Rule 12(b)(6).

## IX.  PLAINTIFFS CAN MAINTAIN A CLAIM FOR ABUSE OF PROCESS AGAINST BOTH DEFENDANTS.

Defendants next claim that the complaint does not sufficiently allege a cause of action for abuse of process.  The Michigan court decision that is most instructive on this point is *Three Lakes Ass'n. v Whiting*, 75 Mich App 564; 255 NW2d 686 (1977).  In that case, Whiting wished to develop a condominium on Torch Lake.  The Three Lakes Association had been vocal in its opposition.  Whiting sued the Association and informed it that, if it stopped its opposition to the condominium project, it would drop its lawsuit.  The Association sued for abuse of process.

Quoting favorably from Prosser, Torts (4th ed.), § 121, p. 857, the Court described an abuse of process claim as follows:

> The improper purpose usually takes the form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself, such as the surrender of property or the payment of money, by the use of process as a threat or a club. *There is, in other words a form of extortion, and it is what is done in the course of negotiation, rather than the issuance of any formal tort itself, which constitutes the tort.*

*Id.* at 573 (emphasis in original).

The Court of Appeals held that by offering to drop the lawsuit in exchange for the cessation of all criticism of the project, Whiting had evidenced its ulterior purpose and an irregular use of process.  In other words, the purpose of the lawsuit was to quiet the criticism, not adjudicate the claims.  The irregular use of process was using the burden of litigation to coerce.  Therefore, the Court held that the plaintiffs had sufficiently stated a cause of action.

In this case, the Ryans allege that the divorce from parent, emancipation, and abuse and neglect claims were not truly filed for the purpose of obtaining an adjudication on those claims.  Instead, they were filed for the purpose of obtaining the improper interim orders and for the purpose of using the horror of the litigation process as a lever to coerce the Ryans to

34

agree to a guardianship arrangement.  There are specific factual allegations made in the complaint to support that theory.

First, ¶¶ 45-77 of the complaint detail all of the fatal deficiencies with the claims Benedict filed.  If those allegations are true, which for purposes of this motion they must be treated as true, it is legitimate to conclude that Benedict's true purpose could not have been to obtain an adjudication on the merits of the claim she made because they were so fatally defective.

Also, in the complaint at § 11, the Ryans alleges that McGinn-Loomis and Benedict initially conspired to file a petition for Loomis to become Claire's legal guardian. Paragraphs 78-79 then allege that on December 12, 2001, Benedict filed a perjurious petition for appointment of Guardian and announced that she would, in light of the petition for guardianship, dismiss her emancipation, and abuse and neglect claims.  Paragraphs 89, 90-91 of the complaint detail the interim orders that Judge Gardner issued and Benedict's improper conduct in procuring those orders.

In sum, the detailed allegations of the complaint certainly support the theory that Benedict, in conspiracy with McGinn-Loomis, could not have filed the claims that she did because she expected to prevail on the merits.  Instead, she filed those claims so that she would have a vehicle for procuring interim orders that would deprive the Ryans of the right to be parents to their child and would create the specter of horrible litigation so that the Ryans would be coerced into simply giving up.  This is the definition of abuse of process in the State of Michigan.  Defendants motions under Rule 12(b)(6) should be dismissed.

## X.   PLAINTIFFS HAVE PROPERLY ALLEGED A CLAIM OF INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AGAINST BOTH DEFENDANTS.

Defendants finally move this Court to dismiss the Ryans' claim of intention infliction of emotional distress under Rule 12(b)(6). This motion, like many of defendants' other motions is premature. In order to prevail on a claim of intentional infliction of emotional distress, the Ryans must prove: (1) extreme and outrageous conduct by the defendants; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Duran v. The Detroit News*, 200 Mich App 622, 629-630; 504 NW2d 715 (1993). The Ryans properly allege each of these elements in Count VII of their complaint and intend to prove these elements at trial.

Under Rule 12(b)(6), a district court may dismiss a claim "'only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint.'" *Bosscher*, *supra*, quoting *Zolman*, *supra*. The Ryans' allegations with respect to this claim are unquestionably sufficient to survive a 12(b)(6) motion. Defendants' motion on this count should therefore be denied.

### CONCLUSION

The *Rooker-Feldman* doctrine is not applicable because the Ryans' claims challenge the propriety of defendants' conduct, not the propriety of the conduct of the state court. The *Younger* doctrine is also not applicable because the Ryans do not have an adequate opportunity in the pending state-court proceeding to raise the constitutional claims that they have raised here. And the *Parratt* doctrine is not applicable because the Ryans allege constitutional deprivations pursuant to an "established state court" procedure and because they claim, *inter alia*, a substantive due process violation. The Ryans' pendent state-law claims should not be dismissed because they are all well-pleaded and because defendants' 12(b)(6) motions attacking the state-law claims are premature. Nor is McGinn-Loomis immune from suit on the allegations

36

made in this case.  Finally, the question whether McGinn-Loomis acted "under color of state law" is also premature.  And if it is not, the Ryans' have alleged (and defendants have conceded) sufficient facts to withstand a 12(b)(6) motion on the question whether McGinn-Loomis abused her position as a court clerk.  For all of these reasons, defendants' motions to dismiss under Rules 12(b)(1) and 12(b)(6) must be denied.

Respectfully submitted,

MILLER, JOHNSON, SNELL & CUMMISKEY, P.L.C
Attorneys for Plaintiffs

Dated: September 22, 2003

By _James S. Brady_
James S. Brady
Richard E. Hillary, II

Business Address:
250 Monroe Ave., N.W., Ste. 800
P. O. Box 306
Grand Rapids, MI  49501-0306
Telephone:  (616) 831-1700