UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FILED - GR
04 JAN 29 PM 3:23
RONALD ... SR., CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT MICH
BY ___

TIMOTHY J. RYAN, and
CHRISTINE A. RYAN,

      Plaintiffs,

v.

ADELE McGINN-LOOMIS, and
MARY BENEDICT,

      Defendants.

Case No. 1:03-cv-439

Hon. David W. McKeague

Hon. Joseph G. Scoville

---

James S. Brady (P11110)
Richard E. Hillary, II (P56092)
Attorneys for Plaintiffs
250 Monroe Avenue, N.W., Suite 800
P.O. Box 306
Grand Rapids, MI 49501-0306
(616) 831-1700

Judy E. Bregman (P32252)
Bregman & Welch
Attorneys for Defendant
Adele McGinn-Loomis
212 Washington Avenue
P.O. Box 885
Grand Haven, MI 49417
(616) 846-3145

Michael J. Sullivan (P35599)
Collins, Einhorn, Farrell &
  & Ulanoff, PC
Attorneys for Defendant
Mary Benedict
4000 Town Center, Suite 909
Southfield, MI 48075
(248) 355-4141

Jeffery S. Crampton (P44114)
Thomas F. Koernke (P26205)
Koernke & Crampton PC
Attorneys for Non-Parties Gardner,
Ingram, Fountain and Hillary
The Boardwalk, Suite 250
940 Monroe Avenue NW
Grand Rapids, MI 49503
(616) 458-7900

---

**PROPOSED JUDICIAL DEPONENTS
GARDNER, INGRAM, FOUNTAIN, AND HILLARY'S
BRIEF IN OPPOSITION TO MOTION TO COMPEL DEPOSITIONS**

I.  **When Any Claim Or Defense Is Determined By Looking To State Law, The Rule Of Privilege Is Also Determined By State Law.**

The federal law of privileges is governed by Fed. R. Evid. 501. The rule initially provides that federal common law shall govern, but adds, "with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness . . . shall be determined in accordance with State law." Thus, the initial inquiry regarding plaintiff's Motion to Compel must be whether state or federal law determines the testimonial privilege of the instant judicial deponents.

Paragraph 3 of this Court's November 25, 2003 Order limits discovery in this action solely to the issue of whether defendant McGinn-Loomis was acting under color of state law. That issue necessarily contains two components: (1) whether Ms. McGinn-Loomis acted as an agent of the government, and (2) if so, whether she was a state or county actor. Defendants correctly point out that the former inquiry is normally determined by federal common law. However, the later question is controlled by state law. See, Franklin v. Zaruba, 150 F.3d 682 (7th Cir. 1998).

In Franklin, the Court held that, for § 1983 purposes, while a county sheriff may be a county officer, if the duties he exercises which are the subject of the lawsuit were performed on behalf of the state, he would be entitled to Eleventh Amendment immunity. Id. at 684. In conducting this factual inquiry, the Court ruled, "A sheriff's status as a state or county official depends to a large extent on the definition of the sheriff's duties under substantive state law." Id. See also, McMillian v. Monroe County, Alabama, 520 U.S. 781, 786, 117 S. Ct. 1734, 138 L. Ed. 2d 1 (1997), ("'[t]he federal question [of whether an actor was a state or county actor] can be answered only after considering the provisions of state law that define the agency's character.'")

- 1 -

The same is true in this case.[1] Ms. McGinn-Loomis may have engaged in governmental action, either on behalf of the county (as a deputy county clerk) or on behalf of the state (as state a deputy circuit court clerk). The answer to this question (and whether Ms. McGinn-Loomis is entitled to Eleventh Amendment immunity) will depend on Michigan state law. Because this is "an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness [Judge Gardner, her staff, and Judge Hillary] . . . shall be determined in accordance with State law."

The District Court of New Hampshire also applied that state's judicial-testimony privilege to ex parte communications with a judge prior to or during a pending case. Phelan v. Thompson, 161 F.R.D. 7 (D.N.H. 1994). There, the plaintiff in a civil action[2] against the chief of police sought to compel the testimony of a state court judge about an ex parte conversation defendant had with the chief of police concerning the application for and issuance of an arrest warrant for the plaintiff. The Court found that New Hampshire had a state-recognized judicial-testimony privilege and held that the judge could not be "subjected to interrogation with respect to the evidence presented before him when there is an existing record thereof." Id.

Michigan also recognizes a very strong judicial-testimony privilege. In Reycraft v. McDonald, 194 Mich. 500, 160 N.W. 836 (1916), the plaintiff sought the testimony of a probate judge regarding ex parte statements made in the judge's office prior to instituting proceedings in which the plaintiff's sanity would be challenged. The Court

---

[1] In Plaintiffs' September 18, 2003, Brief In Opposition To Defendants' Motion To Dismiss, at p. 20, plaintiffs state: "The following facts are undisputed by defendants. During all relevant time periods, McGinn-Loomis was (and still is) a deputy court clerk employed by the State of Michigan and assigned to the Kent County Circuit Court.
[2] The court did not state whether the case was a § 1983 action. Since it concerned the reasons an arrest warrant was issued, it is assumed that it raised civil rights claims of some variety.

subsequently concluded that the defendant had no authority to make the insanity petition and the plaintiff sued the defendant for slander. Since there was no person other than the judge present when the defendant's statements were made, plaintiff sought the judge's testimony about what transpired. The Court held that the statements were absolutely privileged:

> 'We are not disposed to narrow or abridge the right of a citizen to make even an oral complaint before a magistrate charged with the duty of investigating the matters complained of. * * * Such communications are made in the strictest confidence, and are as sacred in the eyes of the law as the communications between client and lawyer, or patient and physician.'[3]

Id. at 503, quoting Flynn v. Boglarsky, 164 Mich. 513, 129 N.W. 674 (1911). Since, as explained below, Judge Gardner has already created a record of the information presented to her in her September 19, 2001 conversations with Ms. McGinn-Loomis and Ms. Benedict, she may not be "subjected to interrogation with respect to" that information.

In fact, requiring the judges or their staff to testify would put them at risk of violating Michigan's Code of Judicial Conduct, Canon 3A(6), which states, "A judge should abstain from public comment about a pending or impending proceeding in any court, and should require a similar abstention on the part of court personnel subject to the judge's discretion and control." See Exhibit 1.

## II. Principles Of Comity Require Application Of The State Law Privilege In This Case.

Even if this Court finds that Fed. R. Evid. 501 does not require it to look to state law, principles of comity should lead to the same conclusion. As noted in Phelan, supra, "there is a 'strong policy of comity between state and federal sovereignties [which] impels

---

[3] The physician-patient absolute testimonial privilege has been continuously recognized in Michigan since prior to 1882. See Storrs v. Scougale, 48 Mich. 387, 12 N.W. 502 (1882). Obviously, the Michigan Supreme Court was well aware of the dimensions of the patient-physician privilege when it equated the judicial privilege with the patient-physician privilege.

federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy.'" Phelan, supra, at 7. Here, there is no cost to federal substantive and procedural policy. Plaintiffs have made no showing that deposing Judges Gardner and Hillary is the only way to obtain the information plaintiffs seek.

Moreover, Canon 3A(6) of the Code of Conduct For United States Judges also recognizes the policy that Michigan's privilege protects:

> A judge should avoid public comment on the merits of a pending or impending action, requiring similar restraint by court personnel subject to the judge's direction and control.

This admonition, like Michigan's Canon 3A(6), demonstrates that the federal courts also recognize the importance of the judicial testimony privilege.[4] See Exhibit 1.

The Seventh Circuit recognized that comity must play a role in determining evidentiary privileges in § 1983 cases in Socialist Workers Party v. Grubisic, 619 F.2d 641 (7th Cir. 1980). There, a prosecutor appealed an order requiring him to produce grand jury transcripts. Because there were no issues to be decided under state law, the federal common law of privileges determined whether the transcripts were exempt from disclosure. However, the Court found that the principle of comity is implicit in the federal common law of privileges. Id. at 643. The Court also determined that Illinois had a strong interest in maintaining the secrecy of the grand jury process. Id.

The Court concluded that where a state has a strong interest in its laws of evidentiary privilege, the party seeking to overcome the state law privilege must make a showing that the need for disclosure is greater than the harm the privilege is intended to

---

[4] The comments to Federal Canon 3A(6) instruct that "the admonition against public comment . . . continues until completion of the appellate process."

- 4 -

protect. Id. at 644. Here, the plaintiffs have made no showing that the testimony is not available to them in some other fashion (in fact, much or all of it is available from other sources) or that the need for the testimony outweighs Michigan's strong interest in precluding its judges from testifying regarding pending matters or regarding pre-suit conversations with potential litigants.

### III.    Federal Common Law Also Precludes The Proposed Depositions.

The significant expansion of the federal common law judicial privilege over the past six decades, from the no questions regarding "mental processes" restriction set forth in United States v. Morgan, 313 U.S. 409, 422; 615 S. Ct. 999; 85 L.Ed. 1429 (1941), to the current much more protective approach, is reflected by the Court's recent analysis in U.S. v. Roebuck, 271 F. Supp. 2d 712, 717-723 (D.V.I 2003). Plaintiffs cited Roebuck with approval at page 7 of their Brief in Support, but failed to analyze or discuss the Court's reasoning. Much like the instant case, in Roebuck one of the parties subpoenaed several judges, in an effort to compel their testimony at a hearing seeking recusal of the trial judge, who was a colleague of the subpoenaed judges. Another District Judge, sitting by designation, quashed the subpoenas after carefully analyzing the dimensions of the federal judicial privilege.

The Roebuck Court began its analysis by citing Morgan, supra, but, went on to explain that the federal common law privilege now affords judicial officials substantially more protection from inquiry regarding their judicial activity:

> Further, only in the most extraordinary of cases, such as a strong showing of bad faith or improper behavior by a judge or quasi-judicial officer or where circumstances were such to overcome the presumption of regularity as to the acts of the decision maker, may a judge be questioned as to matters within the scope of his adjudicative duties.

Id. at 718.

As the Roebuck Court explained, although a judge may be called to testify about relevant matters of fact, the federal courts have expanded the judicial privilege by precluding even factually-based questions which may "probe into the mental processes employed in formulating the judgment in question." Id. at 719. The Court concluded "[t]hus, even factually based questions may be objectionable." Id.

Absent a showing of bad faith on the part of the judges or their staffs, which is not alleged here, the federal common law of privilege is intended to protect all judges. It is not solely for the judge who, in retrospect, is found to have correctly resolved a legal issue or correctly applied the law, or for the judge who issues the popular or seemingly obvious decision, it is also for the judge who is deemed to have made a mistake in the law applied or in the procedure utilized. The Roebuck Court confirmed the importance and, by implication, the scope of the federal judicial privilege, when it stated "[t]he prohibition against compelling the testimony of a judge is to protect the legal system itself." Id. at 722.

The federal judicial privilege has also evolved to preclude inquiring into the internal operations or the internal communications of a court. Roebuck, supra at 722, quoting Terrazas v. Slagle, 142 F.R.D. 136, 139 (W.D. Tex 1992). The Terrazas Court faced a situation roughly similar to the instant circumstances. In Terrazas, the underlying litigation involved a front-page, high profile dispute and, as here, litigants in that case sought to depose staff members of the federal three-judge panel sitting in the underlying matter. In quashing the subpoenas directed to the judicial law clerks, the Court stated:

> All counsel admit that public inquiries by the litigants as to the internal operations and communications of the Court will, not may, destroy the integrity of our present legal system. . . . The judges, with full knowledge of the facts,

>have already determined [on the record] there is no basis to
>require their recusal.

Id.

In summary, federal common law precludes any inquiry which may relate: (1) to a judge's thought processes, (2) to the reasons which motivated the judge's performance of his or her duties, (3) to the internal operations of the judge's court, and (4) to the internal communications of the judge's court. Additionally, even factual inquiries are precluded if they: (1) probe into the mental processes employed by the judge in formulating a decision, or (2) probe into the mental processes involved in the judge discharging his or her duties. As the Roebuck Court stated:

>While a judge enjoys no privilege from being subpoenaed as a witness, it is imperative when he is called to testify as to action taken in his judicial capacity, to carefully scrutinize the grounds set forth for requiring his testimony.

271 F. Supp. 2d at 721.

On pages 2-3 of his January 9, 2004, letter to proposed deponents' counsel, which is attached as Exhibit 2, counsel for plaintiffs listed six subjects about which plaintiffs sought to depose Judge Gardner and her staff. For convenience sake, the subjects will be discussed here in the order listed in Exhibit 2.

Bullets 1 and 2 seek to inquire about "the relationships between Judge Gardner and her staff" with Adele McGinn-Loomis and with attorney Mary Benedict. Relevant questions which did not relate to the pending underlying State lawsuit or to any other pending lawsuit might not be precluded by Michigan or federal common law.[5] However,

---

[5] The Michigan Court of Appeals issued its decision in Ryan v. Ryan, Case No. 01-09528DZ, on January 15, 2004. The 21 day appeal or motion for reconsideration period on that decision will not expire until Friday, February 6, 2004. The Court of Appeals' procedure in a remand situation is not even to transmit the case file until after the appeal period has expired. For that reason, Case No. 01-09528DZ obviously is still pending.

this Court's November 25, 2003 Order, which is attached as Exhibit 3, limited discovery "to the question whether and how defendant McGinn-Loomis, in conspiracy with defendant Benedict, acted under color of state law. . . ." General "relationship" questions to the judge or her staff would not be relevant to the only issue in this case on which plaintiffs are authorized to take discovery.

Bullets 3 and 4 seek to question Judge Gardner or her staff members about the contact between them and Ms. McGinn-Loomis or Ms. Benedict regarding the ex parte Order or other judicial activity in Case No. 01-09528-DZ. Not only would these questions be precluded by Michigan's Canon 3A(6) and by federal common law as improper inquiry into the court's internal operations or into the internal communications between Judge Gardner and her staff, they are also factual questions precluded by the Roebuck Court's analysis. For argument's sake, we can assume that defendants' September 19, 2001, evening contacts with Judge Gardner could have played some role in "motivating" Judge Gardner to act despite the incomplete and, in part, inaccurate paperwork presented to the Judge by defendant Benedict. As such, these contacts cannot be the subject of discovery. Additionally, as in Roebuck, plaintiffs deposed Ms. McGinn-Loomis and Ms. Benedict last week and received sworn answers from both of these non-judicial sources about the very topics on which plaintiffs now seek judicial testimony. Ms. McGinn-Loomis described her September 19, 2001, telephone contact with Judge Gardner as a single telephone conversation of about thirty seconds. See Exhibit 4, pp. 113-114.

Were it not privileged, testimony by Judge Gardner or her staff would be redundant. See e.g., Roebuck, supra at 721, 724-725. At pages 18-19 of the transcript of the hearing on the motion to disqualify, Judge Gardner explained in detail her

recollection of the telephone conversation with Ms. McGinn-Loomis ("no more than two minutes").[6] Thus, the instant situation is not that "most extraordinary" situation which requires the unusual step of deposing judicial officials. Id. at 718. Moreover, as to the state action issue on which discovery is allowed, plaintiffs already have Judge Gardner's confirming testimony regarding the telephone contact with Ms. McGinn-Loomis and there is no reason to conduct a deposition of the same person seeking the same information.

Bullet 5 seeks to inquire about the "[t]he manner in which Case No. 01-09528-DZ was assigned to Judge Gardner." As the Terrazas Court stated:

> 'Oral examination of a judicial or quasi-judicial officer as to matters within the scope of his adjudicative duties should be permitted only upon a strong showing of bad faith or improper behavior.'

142 F.R.D. at 139. As discussed above, plaintiffs do not allege bad faith or comparable conduct by Judge Gardner, by her staff members, or by Judge Hillary. Rather, plaintiffs' counsel expressly stated that plaintiffs had no basis on which to assert bias or prejudice. Further, plaintiffs must fully expect that Judge Gardner, if her deposition were ordered, would be an honest and unbiased witness or plaintiffs would not have expended and continue to expend significant efforts in an attempt to depose her. The Terrazas analysis, which was cited with approval in Roebuck, clearly precludes the inquiry proposed by Bullet 5.

---

[6] The relevant portion of the transcript is attached as Exhibit 5. At page 17, counsel for plaintiffs asserts "the appearance of impropriety" as the basis for the State court motion for disqualification of Judge Gardner. Counsel for plaintiffs added "I have no idea, as I've said already twice, whether the Court, in fact, has a bias or a prejudice. . . . and I am willing to believe everything the Court did was well-intended." Clearly, plaintiffs are not asserting "bad faith" or comparable conduct by Judge Gardner. The absence of bad faith conduct by the Judge is reinforced by the fact that after Judge Gardner denied the motion for disqualification, plaintiffs appealed that ruling to Chief Judge George Buth of the Kent County Circuit Court who reviewed the matter and affirmed Judge Gardner's ruling.

Bullet No. 6 seeks "[a]n explanation regarding the timing and sequence of a set of ex parte orders signed September 19, 2001." By using the plural, "orders," plaintiffs contend only that two copies of the same Order were executed. See, First Amended Complaint and Jury Demand, ¶25. In any event, the Bullet 6 inquiry would violate federal common law because it seeks information relating to the reasons which motivated Judge Gardner to perform her duties as she did and because such inquiry, indirectly if not directly, seeks to probe the judge's mental processes in discharging her duties or to probe the internal communications of Judge Gardner's Court.

Finally, prior to January 23, 2004, counsel for plaintiffs contacted counsel for the judges concerning Ms. McGinn-Loomis' recent deposition testimony regarding her or Ms. Benedict's possible telephone contact with Judge Patrick Hillary on the evening of September 19, 2001, seeking an audience with Judge Hillary. Plaintiffs now want to also depose Judge Hillary. See counsel for Judge Hillary's January 23, 2004 correspondence to plaintiffs' counsel, attached as Exhibit 6. Any such questions for Judge Hillary would impermissibly probe his mental process in granting or denying an audience. Since the telephone contact with Judge Hillary was in his capacity as a judge of the Family Court Division of the Kent County Circuit Court, examination of Judge Hillary on this topic would, directly or indirectly, also impermissibly probe the reasons which motivated the Judge's performance of his duties. See Roebuck, supra at 718-721; Terrazas, supra at 138-139. Also, as with Judge Gardner, defendants' depositions already provide much of the information which could be provided by Judge Hillary were his testimony not privileged. For the reasons discussed herein, proposed deponents request that the subpoenas at issue be quashed.

Respectfully submitted,

KOERNKE & CRAMPTON PC
Attorneys for Non-Parties Gardner,
Ingram, Fountain and Hillary

Dated: January 29, 2004

By: /s/ Thomas F. Koernke
Thomas F. Koernke (P26205)
Jeffery S. Crampton (P44114)
Business Address:
 The Boardwalk, Suite 250
 940 Monroe Avenue NW
 Grand Rapids, MI 49503
 (616) 458-7900