2



## UNITED STATES DISTRICT COURT
### WESTERN DISTRICT OF MICHIGAN

TIMOTHY J. RYAN and
CHRISTINE A. RYAN,

              Plaintiffs,

vs.

ADELE McGINN-LOOMIS and
MARY BENEDICT,

              Defendants.

_____/

Case No. 1:03-CV-439

HON. DAVID W. McKEAGUE

### DEPOSITION OF MARY L. BENEDICT

Taken by Plaintiffs on the 21st day of January, 2004, at the offices of the State Bar of Michigan, 306 Townsend Street, Lansing, Michigan, before Karen L. Banks, Notary Public and Certified Electronic Recorder in and for the State of Michigan, commencing at 8:40 a.m.

**APPEARANCES:**

For Plaintiffs:
    JAMES S. BRADY  (P11110)
    RICHARD E. HILLARY, II  (P56092)
    Miller, Johnson, Snell & Cummiskey, PLC
    250 Monroe Avenue, N.W., Suite 800
    P.O. Box 306
    Grand Rapids, Michigan  49501-0306
    Telephone: (616) 831-1700

For Defendant
Benedict:
    THERESA M. ASOKLIS  (P42709)
    Collins, Einhorn, Farrell & Ulanoff, P.C.
    4000 Town Center, Suite 909
    Southfield, Michigan  48075
    Telephone:  (248) 355-4141

Timothy J. Ryan and Christine A.
Ryan v. Adele McGinn-Loomis, et al

Multi-Page™

Mary L. Benedict - 1/21/04

---

**Page 111**

1  Q  So you did a draft and, after your first copy of the
2     draft, it was either you or somebody noticed that there
3     were some things that needed to be corrected; is that
4     right?
5  A  Yes.
6  Q  And those corrections waited to be done until sometime
7     after the night of the 19th?
8  A  Yes.
9  Q  So these are all things that you talked about with Ms.
10    Loomis in that telephone conversation at five-ish, not
11    that you did them all when you were talking to 'em, but
12    you talked about all these things that you could do in
13    that conversation, and indeed that night you followed
14    up on them; is that right?
15 A  Yes.
16 Q  In that telephone conversation, when you do these
17    pleadings, did you talk about getting a judge to -- or
18    strike that -- filing the papers, when you were going
19    to be able to file the papers or how you were going to
20    obtain the judge's signature on the order, did you talk
21    about that?
22 A  Yes.
23 Q  This is on the telephone conversation, five-ish?
24 A  Yes.
25 Q  In that conversation, who brought that up in terms of

**Page 112**

1     how you were going to reach a judge or how you were
2     going to go about getting a judge?
3  A  I believe I did.
4  Q  And what did you say?
5  A  I said it was going to be difficult to try to reach a
6     judge. It was after hours. It would be difficult to
7     try to reach a judge.
8  Q  Okay. That established, what happened then? I mean,
9     you said that. What was her response or how did you
10    eventually set upon a plan to contact a judge, if
11    indeed you did?
12 A  I believe that I asked Adele to see if she could help
13    me get phone numbers. I know that some of the numbers
14    are in the phone book. I asked if she could help me in
15    locating phone numbers.
16 Q  So in terms of reaching a judge and getting ahold of a
17    judge, you asked Adele if she would help you getting
18    phone numbers of the judges; right?
19 A  Yes.
20 Q  Were there certain judges mentioned?
21 A  No.
22 Q  And what was the plan once a phone number of a judge
23    was obtained?
24 A  I anticipated those numbers would be given to me.
25 Q  You were not going to look up telephone numbers, or was

**Page 113**

1     that just going to be Adele's job?
2  A  I would also look up numbers. I was asking for some
3     help.
4  Q  Okay. What happened next, if you remember?
5  A  Exact orders I do not remember.
6  Q  Well, I mean, did that end the conversation on the
7     telephone once you went through all the alternatives
8     and that if you were going to contact a judge, you
9     needed telephone numbers and Adele would get the
10    telephone numbers? Did that end the conversation or,
11    to the best of your recollection, were there other
12    things talked about?
13 A  No. That, I believe, ended the conversation.
14 Q  Okay. What was the next conversation you had with
15    Adele that night after the telephone conversation at
16    five-ish?
17 A  She called and gave me Judge Gardner's phone number.
18    No, I -- oh. I believe that was the next -- she called
19    and gave me Judge Gardner's phone number.
20 Q  In terms of that conversation which would have been the
21    next conversation you had with Ms. Loomis, was that --
22    strike that. Was there anything else in that
23    conversation discussed other than giving her -- strike
24    that -- she giving you Judge Gardner's telephone
25    number? Was there anything else discussed in that

**Page 114**

1     telephone conversation?
2  A  No.
3  Q  Just the fact that she gave you Judge Gardner's
4     telephone number?
5  A  Yes.
6  Q  Nothing else?
7  A  No.
8  Q  Short conversation?
9  A  Yes.
10 Q  Did she say how she got Judge Gardner's telephone
11    number?
12 A  I don't believe so, no.
13 Q  What did you do, then, after that telephone
14    conversation?
15 A  I called Judge Gardner.
16 Q  What time would that have been?
17 A  I don't know.
18 Q  Well, sometime after five-ish?
19 A  Yes.
20 Q  So do we have an estimate?
21 A  No, I don't.
22 Q  So you just don't know when that was?
23 A  No, I do not.
24 Q  Do you know what time Ms. Loomis called you with Judge
25    Gardner's telephone number?

---

Karen L. Banks, CER 3592
(616) 374-0111

Timothy J. Ryan and Christine A.      Multi-Page™      Mary L. Benedict - 1/21/04
Ryan v. Adele McGinn-Loomis, et al

---

1 A  No, I do not.
2 Q  So you called Judge Gardner?
3 A  Yes.
4 Q  At her home?
5 A  Yes.
6 Q  For what purpose?
7 A  To ask her if she would -- to explain the situation of
8     what was going on with my client and to ask if she
9     would be willing to sign an ex parte order that would
10    keep Claire -- return Claire to Grand Rapids from the
11    Detroit area.
12 Q  What else did you say to her?
13 A  I explained the situation to her.
14 Q  What do you mean, you explained the situation to her?
15    Did you go into the facts?
16 A  Yes, I did.
17 Q  What did you tell her?
18 A  I explained what I knew of Claire; that she was an
19    honor student at Catholic Central; that there were
20    family problems going on; that Claire had been told to
21    leave the home; that Claire was living with family
22    friends until she was -- until her parents asked those
23    friends not to let her stay there any longer; and that
24    Claire then was at the McGinn-Loomis household; that
25    the parents had contacted the police to report her as a
Page 115

1     runaway and then removed her from school on the 18th;
2     and that Claire had called -- or on the 18th, 19th, had
3     called asking for help.
4         And I was asking if the court -- and I had
5     explained my calls at that point with information I had
6     obtained about the types of facilities in Utah, gave
7     her the -- that I had checked with Wayne County and
8     that there had not been any planes going out that day,
9     so my belief was she was still in Wayne County; that I
10    had contacted FIA in Kent and Wayne Counties.
11 Q  Did you tell her what the Kent FIA said, that since she
12    wasn't in Kent County, there wasn't anything they could
13    do?
14 A  Yes. Kent County couldn't do, yes.
15 Q  And you told the judge that?
16 A  Yes.
17 Q  And did you tell her that the Loomis family where she
18    was staying at where the police picked her up was the
19    family of her boyfriend?
20 A  Yes.
21 Q  And you called again Judge Gardner because you had her
22    number; right?
23 A  Yes.
24 Q  You weren't given the numbers of Judge Hillary or Judge
25    Carpenter or Judge Haynes or any other judge; is that
Page 116

1     right?
2 A  Well, the number I had --
3 Q  Answer the question.
4 A  That's correct.
5 Q  And so, based on the fact that Adele called you and
6     said, "Here's Judge Gardner's number," it was part of
7     the plan that you and Adele had the arrangement is that
8     when she gave you the number, you would make the call?
9 A  Yes.
10 Q  You never expressed to Adele Loomis that you would
11    never call the judge at home after hours?
12 A  I told her I had never called a judge after -- at home
13    after hours before.
14 Q  You told her you had never done it before?
15 A  That's correct.
16 Q  Did you tell her that you would never call a judge at
17    home after hours?
18 A  I don't recall saying that. I recall saying, "I've
19    never done that before."
20 Q  So if she recalls that that's what you told her, could
21    she be right?
22 A  She could be.
23 Q  But yet you did it?
24 A  Yes, I did.
25 Q  Now, your practice is family practice. You deal with
Page 117

1     the family division. Did you know who the presiding
2     judge of that court was at that time?
3 A  No.
4 Q  You did not?
5 A  No.
6 Q  You've never had occasion to use the presiding judge of
7     the probate court or the family court division up until
8     that time?
9 A  That's correct.
10 Q  So you never were aware of the court policy that would
11    have required you, in seeking a TRO, that you would go
12    -- if the assigned judge wasn't available, that you
13    would go to the presiding judge? You weren't aware of
14    that policy?
15 A  No.
16 Q  You never had occasion to get a TRO before?
17 A  No.
18 Q  In all your years of practice, you never had an
19    occasion to get a temporary restraining order?
20 A  Not that I'm recalling.
21 Q  Now, you knew, did you not, that your case wasn't filed
22    yet?
23 A  Yes.
24 Q  In fact, it wasn't filed until the next day; is that
25    right?
Page 118

---

Karen L. Banks, CER 3592
(616) 374-0111

Timothy J. Ryan and Christine A.
Ryan v. Adele McGinn-Loomis, et al

Multi-Page™

Mary L. Benedict - 1/21/04

| | |
|---|---|
| 1 A It was filed with the clerk's office the next day. | 1    MS. ASOKLIS: -- a little confusing. |
| 2 Q The 20th? | 2 BY MR. BRADY: |
| 3 A Right. | 3 Q When you had that conversation with Judge Gardner, did |
| 4 Q And we're talking about the 19th. | 4    you tell her that you had not made an attempt to |
| 5 A Right. | 5    contact the Ryans about seeking a restraining order? |
| 6 Q So you knew that there wasn't any matter pending in the | 6 A I do not recall. |
| 7    Kent County courts? | 7 Q So you could have or you may not have? |
| 8 A Correct. | 8 A That's correct. |
| 9 Q You had a conversation with Judge Gardner that you | 9 Q Just don't recall? |
| 10    related to us. Is there anything else that you talked | 10 A That's correct. |
| 11    about with Judge Gardner? | 11 Q And we don't have any notes of this conversation -- |
| 12 A No. | 12    strike that. You don't have any notes of this |
| 13 Q What did Judge Gardner say to you? | 13    conversation with Judge Gardner? |
| 14 A She said that she would be willing to sign an order | 14 A Correct. |
| 15    that simply had Claire returned to Grand Rapids, stay | 15 Q No memorandum in your file; is that right? |
| 16    at The Bridge for two weeks, and that then the court | 16 A That's correct. |
| 17    would further hear this case. | 17 Q And what you're testifying to is, to the best of your |
| 18 Q So you actually talked about that with -- the actual | 18    ability, what you remember? |
| 19    contents of the order, you talked about that with the | 19 A That's correct. |
| 20    judge? | 20 Q And did you tell Judge Gardner that you made no attempt |
| 21 A Yes. | 21    to contact either Tim Ryan or Chris Ryan or Laurie |
| 22 Q Did the judge ask you, "Have you notified the Ryans, | 22    Murphy, who you had spoken to earlier; is that right? |
| 23    the defendants in this case?" Did the judge ask you if | 23    Yes or no? |
| 24    you notified them about the fact that you were seeking | 24 A I don't recall. |
| 25    a TRO? | 25 Q And as a matter of fact, you do recall that you made no |
| Page 119 | Page 121 |

| | |
|---|---|
| 1 A No. | 1    attempt to contact Tim Ryan; is that right? |
| 2 Q The judge didn't ask you anything about that? | 2 A That's correct. |
| 3 A I believe I had expressed that I believed that the | 3 Q Because you believed he was with his daughter, either |
| 4    Ryans were with -- in fact, I knew that Tim Ryan was | 4    on the way to Utah or in Utah; is that right? |
| 5    with Claire. | 5 A No. I believed he was in Detroit with his daughter. |
| 6 Q You said first "Ryans," and then you said "Tim Ryan." | 6 Q Okay. And that information got to you from Ms. Loomis? |
| 7    Let's go back and try to focus in on my question. Did | 7 A Yes. |
| 8    the judge ask you if you attempted to notify the Ryans | 8 Q You made no effort to contact the mother, Chris Ryan; |
| 9    or their lawyer that you were attempting to seek a | 9    is that right? |
| 10    restraining order? | 10 A That's correct. |
| 11 A I had told the judge about the issue -- | 11 Q Because you believed also that she was in Detroit with |
| 12 Q Excuse me. | 12    Claire Ryan; is that right? |
| 13 A No. | 13 A I didn't know where Chris was. |
| 14 Q No? | 14 Q Okay. But you made no attempt to call her on the phone |
| 15 A I don't recall the judge asking me that question. | 15    or to send a process server or you yourself go out to |
| 16 Q In this conversation with the judge, did you tell him | 16    their home and notify her? |
| 17    that you did not attempt to contact the Ryans? | 17 A That's correct. |
| 18    MS. ASOKLIS: Did you say "him"? | 18 Q And you made no attempt to notify Laurie Murphy, who |
| 19    MR. BRADY: I'm sorry. | 19    was a lawyer that you had talked to before, about the |
| 20    MS. ASOKLIS: Are you referring to Judge | 20    Ryans; is that right? |
| 21 Gardner? | 21 A That's correct. |
| 22    MR. BRADY: Yes. | 22 Q Other than what you related to about your conversation |
| 23    MS. ASOKLIS: Okay. Why don't you restate | 23    with Judge Gardner on the telephone that night -- and I |
| 24 the question, because it was -- | 24    think we've covered this and I apologize for going over |
| 25    MR. BRADY: Sure. | 25    it again -- but Judge Gardner, in agreeing to sign the |
| Page 120 | Page 122 |

Karen L. Banks, CER 3592
(616) 374-0111

Timothy J. Ryan and Christine A.
Ryan v. Adele McGinn-Loomis, et al

Multi-Page™

Mary L. Benedict - 1/21/04

---

1 order, never questioned you about -- strike that. In
2 your discussions with Judge Gardner, did she or did she
3 not know that a complaint had not actually been filed
4 with the court?
5 A Yes, she knew that.
6 Q She knew one had not been filed with the court?
7 A Yes.
8 Q And that you were going to file one with the court?
9 A Yes.
10 Q And she never said to you that this is something the
11 presiding judge should sign?
12 A No, she did not.
13 Q And again, you went to Judge Ryan -- excuse me -- Judge
14 Gardner because Ms. Loomis gave you her phone number;
15 is that right?
16 A Yes.
17 Q After the conversation with Judge Gardner, what, if
18 anything, did you do next?
19 A I completed drafting the pleadings and went to meet
20 with Ms. -- or Judge Gardner.
21 Q And you said you completed drafting the pleadings, the
22 three that I'm aware of from your prior testimony: the
23 affidavit which was to be signed by Ms. Loomis, the
24 complaint, and the order?
25 A Yes.

Page 123

1 MS. BREGMAN: That's the "Y.W."
2 MR. BRADY: The "Y.W.," yeah. They kind of
3 all run together.
4 BY MR. BRADY:
5 Q Do you know why she picked that?
6 A Because her children were going swimming there and she
7 was taking them there.
8 Q Did you meet in a particular room?
9 A I met her in a room off of the pool. Yes.
10 Q What time was this meeting? Do you know?
11 A I don't know the exact time.
12 Q Do you have any idea? I mean, are we talking five?
13 Are we talking six? Talking seven? Talking eight?
14 Are we talking nine?
15 A I believe it was around eight o'clock.
16 Q Who was present for this meeting, as best you recall?
17 A Judge Gardner and myself.
18 Q Was there a court reporter there?
19 A No, there was not.
20 Q And what was discussed in that meeting?
21 A Only if I had received any additional information, and
22 then the judge reviewed the pleadings and signed the
23 order.
24 Q Did you have additional information?
25 A Not at that time.

Page 125

---

1 Q Is that what you completed?
2 A Yes.
3 Q So did you have -- when you went to meet with Judge
4 Gardner, did you have all those with you?
5 A Yes, I did.
6 Q So you had a draft of the affidavit. Again, I think
7 you testified that on the night of the 19th that wasn't
8 finalized yet because you had to make some changes?
9 A That's correct.
10 Q But the complaint was done?
11 A Yes.
12 Q So you had that?
13 A Yes.
14 Q And you had the order?
15 A Yes.
16 Q Where did you meet Judge Gardner?
17 A At the YWCA or YMCA down on Sheldon.
18 Q Who picked that location?
19 A The judge.
20 Q Why? Do you know why she picked the "Y"? Was it the
21 YMCA or the -- did you say the "Y.M." or the "Y.W."?
22 I'm sorry.
23 A I'm not sure which it is. I think it's the YWCA. I'm
24 not sure which it is. It's the "Y" on Sheldon.
25 Q Okay. That would be the "Y.W."

Page 124

1 Q So you really didn't talk about anything? You really
2 didn't add anything to what you had told her over the
3 phone, other than the fact that she took the pleadings
4 you gave her; right?
5 A Yes.
6 Q Again, not to be redundant, but just so I know we're
7 clear in our mind, the affidavit, that eventually was
8 signed by Ms. Loomis; right?
9 A Yes.
10 Q The initial complaint for divorce?
11 A Yes.
12 Q And the order -- excuse me -- that you wanted the judge
13 to sign?
14 A Yes.
15 Q Did she read those or did it appear to you that she
16 read those?
17 A Yes.
18 Q How long did it take?
19 A Five, ten minutes.
20 Q And to the best of your recollection, she asked you no
21 questions other than if there was any additional
22 information, and you don't think that there was any; is
23 that right?
24 A That's correct.
25 Q Other than that question, did she ask you any other

Page 126

---

Karen L. Banks, CER 3592
(616) 374-0111

Page 123 - Page 126

Timothy J. Ryan and Christine A.
Ryan v. Adele McGinn-Loomis, et al

Multi-Page™

Mary L. Benedict - 1/21/04

**Page 139**

1  A  I don't remember exactly, no.
2  Q  Eleven-ish?  Ten-ish?
3  A  I want to say it was between 8:30 and nine.
4  Q  Okay.  So, eight-thirty-ish?
5  A  Yes.
6  Q  That fair?
7  A  Yes.
8  Q  Okay.  Because after that time you did nothing in
9     relation to the Claire Ryan matter until the next day?
10  A  That's correct.
11  Q  And you didn't return -- you did not return to your
12     office?
13  A  No, I did not.
14  Q  I want to just mention a couple names and just ask me
15     -- excuse me -- I'm asking whether or not you had any
16     telephone conversations or meetings with these persons.
17     Okay?
18        MS. ASOKLIS:  On a particular date?
19        MR. BRADY:  Oh, I'm sorry.  The 19th between
20     -- I'm sorry.  I thought I went through all this.
21  BY MR. BRADY:
22  Q  Between five o'clock and now eight-thirty-ish.
23  A  Okay.
24  Q  Because that's the last time you did any work on this
25     matter.  Okay?  Is that right?  I mean --

**Page 140**

1  A  On the 19th, yes.
2  Q  Yeah.  Did you talk to Judge Hillary?
3  A  Yes, I did.
4  Q  Judge Haynes?
5  A  No, I did not.
6  Q  Any other judges?
7  A  No.
8  Q  Any court personnel?
9  A  No.
10  Q  Lawyers?  You mentioned your classmate.
11  A  No.
12  Q  Anybody else other than people that we've talked about
13     already and Judge Hillary, who we haven't talked about,
14     between five-ish and eight-thirty-ish that you talked
15     to regarding the Claire Ryan matter?
16  A  I don't recall anyone else.
17  Q  Did you talk to Judge Hillary before or after you spoke
18     to Judge Gardner?
19  A  Before.
20  Q  Did you speak to Judge Hillary before or after you got
21     Judge Gardner's telephone number from Adele Loomis?
22  A  Before.
23  Q  Do you remember the time you spoke to Judge Hillary?
24     Do you remember that time?
25  A  No, I do not.

**Page 141**

1  Q  So it was sometime between the five-ish area and the
2     time that you talked to Adele and she gave you Judge
3     Gardner's telephone number; is that right?
4  A  Yes.
5  Q  Was it after the -- okay.  Strike that.  Did you call
6     Judge Hillary or did Judge Hillary call you?
7  A  Judge Hillary called me.
8  Q  Did he indicate to you why he was calling you?
9  A  He had indicated that he had a phone call from Adele
10     regarding a problem, and was calling me to get
11     information on it.
12  Q  That's what he said to you that you remember?
13  A  That's the gist of it, yes.
14  Q  Well, I'd like a little bit more than the gist of it,
15     if you can remember.  I want you to remember when he
16     called as to why he said he was calling.
17  A  He said he was calling me because he had received a
18     call from Adele.
19  Q  Adele who?  Just Adele?  Did he say Adele Loomis?
20  A  Adele McGinn-Loomis.
21  A  Is that what he said?
22  A  I don't remember if he used a full name.  I don't
23     remember.
24  Q  Okay.
25  A  And that he was -- he understood there was a problem

**Page 142**

1     and he was calling to talk to me about it.
2  Q  And what did you say?
3  A  I talked to him about what I knew of the situation at
4     that time.
5  Q  Was that basically the same things you told to Judge
6     Gardner?
7  A  I don't recall time frames as to what information I
8     received between those two phone calls.
9  Q  But you told him what you knew of the facts at that
10     time?
11  A  Yes.
12  Q  That Claire had been removed from her home and to the
13     best of your knowledge was in Detroit, on her way
14     perhaps to someplace in Utah?  Generally what you knew;
15     right?
16  A  Yes.
17  Q  And that Claire -- you were representing Claire, your
18     client, or the attorney for Claire?
19  A  Yes.
20  Q  So you told him the facts as best you understood them
21     at that time?
22  A  Yes.
23  Q  What did he say?
24  A  He indicated that he didn't think there was anything
25     that he could do to help me, but that I should keep

Karen L. Banks, CER 3592
(616) 374-0111

Timothy J. Ryan and Christine A.  
Ryan v. Adele McGinn-Loomis, et al

Multi-Page™

Mary L. Benedict - 1/21/04

---

1  contacting other judges.  
2  Q  Did he say why he couldn't help you?  
3  A  No.  
4  Q  He just said he couldn't help you?  
5  A  He didn't think that he could.  
6  Q  He didn't think he would or he didn't think he could?  
7  A  Could.  
8  Q  He's the same type of judge as Judge Gardner?  
9  A  Yes.  
10 Q  He doesn't have any less power or more power than Judge  
11    Gardner, --  
12 A  No.  
13 Q  -- does he?  
14 A  No.  
15 Q  But he said he didn't think he could help you; right?  
16 A  Yes.  
17 Q  But he said to keep trying other judges?  
18 A  Yes.  
19 Q  He told you that?  
20 A  Yes.  
21 Q  Did he say anything about which judge to try?  
22 A  No, he did not.  
23 Q  But you laid out the scenario as best you understood  
24    it?  
25 A  Yes.  

Page 143

---

1  Q  Were other judges mentioned when he said -- he  
2     encouraged you to try other judges?  Were other judges'  
3     names given by him?  
4  A  No.  
5  Q  So you don't know exactly whether he got the same  
6     factual basis that Judge Gardner got, but he got  
7     whatever you knew at that time?  
8  A  Yes.  
9  Q  He didn't say, "You've not given me enough facts.  You  
10    need to go out and get more information"?  He just said  
11    that he -- as far as you know, he said that he couldn't  
12    help you?  
13 A  He didn't feel he could help on this case.  
14 Q  But he didn't say why?  
15 A  No, he did not.  
16 Q  Do you have notes of that conversation?  
17 A  No, I do not.  
18 Q  Everything you're telling me is based on your  
19    recollection?  
20 A  Yes.  
21 Q  Now, I've reviewed a lot of documents in this case,  
22    including the grievance and your response to the  
23    grievance, including briefs that was filed.  I've never  
24    heard -- I've never read reference to that conversation  
25    with Judge Hillary.  Why?  Is this the first time  

Page 144

---

1  you've thought of it?  
2  A  No.  That, I believe, is -- no.  
3  Q  You think I'm wrong?  You think there is reference of  
4     that in your response on the grievance matter to your  
5     conversation with Judge Hillary?  
6  A  I don't know.  I believe that there is references, yes.  
7  Q  To your conversation with Judge Hillary?  
8  A  Yes.  
9  Q  When he initially talked to you, he said he was calling  
10    based on a request from Adele, and you don't remember  
11    whether he used her full name or not?  You don't  
12    remember that; is that correct?  
13 A  That's correct.  
14 Q  Did he relate to you what Adele may have told him?  
15 A  No, he did not.  He indicated to me he wanted to know  
16    what the situation was and was trying to get  
17    information from me.  He didn't indicate that he knew  
18    anything.  
19 Q  And that was before your conversation with Judge  
20    Gardner?  
21 A  Yes.  
22 Q  And so before you talked to Judge Hillary, you know  
23    from that conversation that Adele and he had spoken?  
24 A  Could you state that again, please?  
25 Q  Do you know that Judge Hillary and Adele had talked?  

Page 145

---

1  A  I don't know that they talked.  
2  Q  I thought you just said he got his --  
3  A  He said he had a call from Adele, and he called me,  
4     wondering what the situation was.  I can infer that  
5     they spoke.  
6  Q  So you inferred that he spoke, but you -- he didn't  
7     tell you that he had talked to Adele?  
8  A  I don't recall that, no.  
9  Q  Did Adele tell you that she spoke to Judge Hillary?  
10 A  I think she did, yes.  
11 Q  And when would that have been?  
12 A  That she spoke with him?  
13 Q  No.  When did she tell you that she spoke to him?  
14 A  I don't know.  
15 Q  Would it have been the night of the 19th that she tell  
16    you that she spoke to him?  
17 A  Yes.  
18 Q  So she told you two things, and that's kind of an  
19    unclear question.  On the 19th she told you on the 19th  
20    she spoke to Judge Hillary; right?  
21 A  Yes.  
22         MR. BRADY:  Ms. Asoklis, do you have the  
23    exhibits from the other deposition in front of you, or  
24    do you want me to give her copies of these?  
25         MS. ASOKLIS:  I have copies.  

Page 146

---

Karen L. Banks, CER 3592  
(616) 374-0111

Page 143 - Page 146

Timothy J. Ryan and Christine A.
Ryan v. Adele McGinn-Loomis, et al

1    MS. ASOKLIS: That's correct.
2    MR. BRADY: -- that she may have had with
3  Claire Ryan?
4    MS. ASOKLIS: That's correct. In my view,
5  I've allowed you a lot of leeway, but I think events
6  that occurred after the "DZ" case ended are far beyond
7  the scope of Judge McKeague's limiting order, so I'll
8  instruct her not to answer.
9    MR. BRADY: So I can't --
10    MS. ASOKLIS: I'm following the judge's
11  order.
12    MR. BRADY: Well, you are to the best of your
13  knowledge in terms of what you think that order says.
14  I think I'd be permitted to ask those questions and I
15  think they go to the heart of the case, because I don't
16  know what they were about and I'm entitled to make that
17  decision as to whether or not they go to state action
18  or not. The judge. Not me, not you, not Judy, not
19  anybody. That's him.
20    MS. ASOKLIS: Right.
21    MR. BRADY: So, I won't ask her any questions
22  about it, but sure as heck would like the opportunity
23  to.
24    MS. ASOKLIS: I understand that.
25    MR. BRADY: Okay. That's it.

Page 191

1    MS. ASOKLIS: Okay. Thank you. Judy, you
2  don't have any questions, do you?
3    MS. BREGMAN: No.
4    MS. ASOKLIS: Okay. We're all done. Thank
5  you.
6    (At 1:28 p.m., deposition concluded.)

Page 192

STATE OF MICHIGAN    )
                     ) ss.
COUNTY OF IONIA      )

    I certify that this transcript, consisting of 193

pages, is a complete, true, and correct record of the

testimony of Mary L. Benedict, taken in this case on January

21, 2004.

    I also certify that prior to taking this deposition,

Mary L. Benedict was duly sworn to tell the truth.

    I also certify that I am not a relative or employee of

or an attorney for a party; or a relative of an attorney for

a party; or financially interested in the action.

Date:  January 25, 2004          *Karen L Banks*

                                 Karen L. Banks, CER 3592

Page 193